STATE, Respondent, vs. SAWYER, Appellant.*

*March 5—April 6, 1954.*

* Motion for rehearing denied, without costs, on June 8, 1954.

496

For the appellant there were briefs and oral argument by *Morris Podell* and *Ray T. McCann,* both of Milwaukee.

For the respondent there was a brief by the *Attorney General* and *William J. McCauley,* district attorney of Milwaukee county, *Herbert L. Mount,* special prosecutor, and *Harold J. McGrath,* special assistant district attorney, and oral argument by *Mr. Mount.*

BROWN, J.   On this appeal Sawyer renews the contention which he made when the case was first before us, namely, that the judgment should be reversed and the indictment dismissed because the delay between the grand jury indictment, April 25, 1950, and his trial which began April 15, 1952, was so long that it denied him the right to a speedy trial as guaranteed by sec. 7, art. I, Wisconsin constitution and amendments V and XIV, United States constitution. This contention was considered and disposed of upon the first appeal, *State v. Sawyer, supra,* pp. 223–225, and is now *res adjudicata.* The state and federal constitutions guarantee a *right* to a speedy, public trial but they do not compel one unless the person accused claims the right. The speedy trial is there for the asking, but the person charged with crime is required to ask for it before he may complain that it has been denied him.

"While there is some authority to the contrary, the general rule is that a demand for trial, resistance to postponement, or some other effort to secure a speedy trial must be made by accused to entitle him to a discharge on the ground of delay,

at least when accused has been admitted to bail, or is not within the custody of the court." 22 C. J. S., Criminal Law, p. 719, sec. 469.

Sawyer was free on bail. He made no demand but acquiesced in such delay as there was. Though in retrospect he considers the delay was unfavorable to him, we conclude for the second time that he was not deprived of a constitutional right.

Appellant submits that upon all the evidence he was entitled to judgment dismissing the indictment, as a matter of law. He contends that the principal witness for the prosecution is unworthy of belief, that the state's evidence is incredible and that a reasonable doubt of guilt, therefore, must exist in spite of such evidence. This contention requires a statement of facts.

In 1948 the city of Milwaukee was engaged in a project to widen Wells street. The common council had final control and authority over the plan and its accomplishment. The city already owned the land on the north side of the street between North Sixth and North Seventh streets where the Sawyer garage was located, and until it was ready to widen that portion of Wells street it rented the premises to Sawyer on a month-to-month lease. In the summer and early fall of 1948 the improvements had reached a stage which involved the street in front of the garage. If the street's width there was to be uniform with that of the rest of the project, the garage would have to be torn down.

There was at this time a member of the Milwaukee common council named Aloysius, or Albert, J. Krause. He was an old acquaintance and customer of Sawyer's, and had bought automobiles from him in 1938 and 1941. In May, 1948, he placed an order with Sawyer for a new Buick automobile and made a deposit. Sawyer informed Alderman Krause that deliveries were very slow and it would be some

time before this order could be filled. From time to time thereafter, Krause stopped at the garage to ask about the prospects for delivery of his car. On one such visit early in September, according to Krause's testimony, Sawyer asked him whether the city was planning to tear down the garage. Krause said he would find out and a little later he informed Sawyer that the schedule called for an early demolition of Sawyer's building. He testified that Sawyer then said to him that it would be worth $3,000 if he could stay at that location. Krause said he would see what he could find out. Thereafter, Krause testified, he made reports to Sawyer, talked to aldermen, attended meetings of council committees in charge of the Wells street project, talked with various city officials on the subject, and became very active in official quarters in Sawyer's behalf. On one of his visits to the Sawyer garage in the fall of 1948, he told Sawyer that Sawyer should sell him at cost the automobile he had ordered in May. "I said, 'If I am going to do some work for you I am entitled to this particular discount because you have—you are not giving anything away, you are just giving it to me at cost.' " Krause testified that Sawyer agreed and it is admitted that he actually did deliver the automobile to Krause at approximately $600 off the list price.

On December 29, 1948, Sawyer received a notice from the city terminating his lease and requiring him to surrender possession of the premises on March 31, 1949. In late January or early February, 1949, the notice was canceled and Sawyer was informed that the buildings on the north side of Wells street between Sixth and Ninth streets would not be wrecked and he might remain where he was.

The deal concerning the automobile is the basis of the first bribery count; the one concerning Sawyer's agreement to pay Krause $3,000 is the basis of the second. The statute

under which Sawyer was prosecuted in its material portion reads as follows:

"346.06 *Bribery of officers.* (1) Any person who shall corruptly give, offer, or promise to any . . . legislative . . . officer of . . . any . . . city . . . any gift or gratuity, or any money, . . . or any pecuniary . . . advantage . . . with intent to influence his vote, opinion, judgment, or action upon any question, matter, cause, or proceedings which may then be pending or which may by law come or be brought before him in his official capacity, and any such officer who shall corruptly accept or receive any such gift . . . under any agreement or understanding that his vote, opinion, judgment, or action should be thereby so influenced shall be punished. . . ."

The essence of the offense prohibited by this statute is the corrupt bargain. As the trial court correctly instructed the jury, if payment is made to the officer for the purpose of influencing his conduct in respect to matters which may come before him in his official capacity, it is immaterial to the guilt of the payor whether or not the official's conduct was actually influenced or whether the purpose of the bribe was fulfilled. Attention, then, must be directed to the question of whether the prosecution proved that Sawyer offered or paid or gave, and Krause accepted or received money, property, or pecuniary advantage with corrupt intent, as defined in the statute. Krause's testimony regarding his demand for and receipt of a discount on the purchase of the automobile, and his testimony in reference to Sawyer's offer to him of $3,000 if his garage was not disturbed, has been referred to. He further testified that Sawyer paid him $1,500 in cash shortly before April 25, 1949, and $1,500 more, shortly before May 24, 1949, and that such payments were for his influence in preventing the demolition of the building and were pursuant to the several discussions he had with Sawyer between the early part of September, 1948, and the latter part of De-

cember. Krause's testimony was complete and, if it can be believed, is conclusive upon the question of Sawyer's guilt.

To be sure, Sawyer testified that the entire story of the cash bribe was a fabrication, and denied it *in toto*. Concerning the automobile sold Krause at a discount, Sawyer admitted the sale and the discount but attributed the reduced price to friendship, the circumstance that he had no salesman's commission to pay, and the fact that in 1938 and 1940, before Krause was an alderman, he had discounted the price to Krause on other purchases without any suspicion of corruption. But, after all, it was for the jury to weigh the testimony and determine for itself whether the purpose of the discount was to honor the claims of friendship or to secure the services of an alderman. In response to questions by appellant's counsel, Krause's answers frequently varied from those he gave to the same questions in the first trial and on other occasions, but we cannot regard the discrepancies as significant. They involve matters of recollection such as to the dates on which events occurred or conversations took place and in our opinion do not go to the substance of the testimony. Such differences do not render the substance, which the jury did believe, unbelievable.

Much more serious are the inducements for Krause to commit perjury in order to accommodate the prosecution. At the time of the first trial Krause had already been convicted of accepting bribes in exchange for his influence as an alderman in the distribution of liquor licenses (*State v. Krause* (1951), 260 Wis. 313, 50 N. W. (2d) 439), and he was serving the sentence then imposed in the state prison. He was also under indictment for his participation with Sawyer in the present alleged bribery and had pleaded not guilty and he had been indicted for five other offenses which had not yet come to trial. Sawyer's counsel argues persuasively that the displeasure of the state could count heavily

in the disposition made of such pending matters and in the grant or refusal of a parole in the matter of the sentence which Krause was already serving. It is submitted that Krause was well aware of these possibilities and governed his testimony accordingly. He turned state's evidence in the Sawyer matter, thereby gaining immunity for his part of that crime, if one had actually been committed, and soon after the first trial he was released from the prison on parole and settled in California, whence he returned to testify at the retrial. (Appellant's brief is in error in stating that Krause was pardoned. There is no support in the record for the statement.) Just before the first trial began, two of the five pending felony charges were dismissed by the state, two more were dismissed a few weeks after the trial, and upon a plea of guilty to the fifth a suspended sentence was imposed. An employee of the state prison also testified that after Krause came back following the first trial the witness heard him say that he was well satisfied with the deal he had made with the state.

There is not the slightest doubt that there were strong motives for Krause to testify in such a way as would please the prosecution even if the testimony did not conform to the fact. Counsel for appellant forcefully pointed out to this court what the motives were and attributed Krause's change of front to them. We cannot doubt that he was equally emphatic when he addressed the jury. Furthermore, the trial court instructed the jury that the witness' interest in the result of the trial may be considered in determining his credibility, that the evidence of an accomplice (naming Krause) should be examined with the utmost care and caution and the jury should also consider that Krause had been promised that he would not be prosecuted; also that the law assumes that a witness who has been convicted of a crime may not be as worthy of belief as a witness who has not and the jury

may bear this in mind in determining his credibility and the weight to be given to his testimony. We think the jury was thoroughly informed that Krause's testimony was *prima facie* unreliable and if there was no other evidence than his against the defendant it would have been surprising indeed if the jury had convicted.

But there was other evidence. In November, 1949, a meeting of businessmen was held at Lakota's restaurant to arrange a celebration of the opening of Wells street. Sawyer attended and so did Alderman McGuire and Alderman Quirk. Quirk introduced McGuire to Sawyer. The three sat down at a table but Quirk was called away almost immediately. McGuire testified that he then asked Sawyer if he had paid Krause anything and Sawyer replied, "Yes, three thousand." They were then interrupted and as they left the table Sawyer said to McGuire, "I will call you later." A few days later McGuire had a telephone call from a person who said he was Sawyer and who referred to their conversation at Lakota's. The speaker then said that he had paid three thousand to Krause but one thousand was to go to Alderman X and one thousand to Alderman Y. A week or so later McGuire telephoned Sawyer to ask him to have a talk with the mayor and the city attorney. The person who responded as Sawyer had the same voice as the person introduced as Sawyer at Lakota's and the person who called McGuire a few days afterward to continue the discussion. In this conversation when McGuire called him, Sawyer, if it was he, said (McGuire testifying) :

"*Q*. What was said? Just relate the conversation as it occurred. *A*. He said, 'You made a mistake, I did not tell you that I gave him $3,000, I gave him a $3,000 heap.'

"*Q*. What did you say? *A*. I said, 'What do you mean by "heap"?' He said, 'I sold the man a car and he paid for it.'

"*Q*. Was anything further said by you? *A*. I said, 'Well, according to the rumors, from what you told me the first

time, I thought you had paid him $3,000.' He said, 'You have got that all wrong.' "

Appellant submits that the speaker in the conversation a week after the meeting at Lakota's was not sufficiently identified as Sawyer and, consequently, it was error for the court to admit McGuire's testimony of that event. Sawyer admitted a conversation with McGuire at Lakota's and the one over the phone when McGuire asked him to talk to the mayor, which invitation, Sawyer said, he declined. McGuire said the voice in all three interviews was the same. Two times it was certainly that of Sawyer. We think the identification of the voice in the other conversation was sufficient and there was no error in admitting the testimony of the first telephone conversation.

Appellant also submits that the conference between Sawyer and McGuire at Lakota's was interrupted and that it was error for the trial court to admit in evidence a fragment of an answer. The reply to that is that Sawyer's answer to McGuire's question, "Did you pay Krause anything?" was responsive and it was complete. In addition, when Sawyer called McGuire up a few days later, as he had said he would do, there was no interruption and what he wanted then was to repeat that he had paid Krause $3,000 but that Krause had to divide it with other aldermen. We find no error in the court's receipt of McGuire's testimony. We note, too, that Sawyer's later version "I gave [or sold] him a $3,000 heap and he paid for it" is not responsive to the question "Did you pay Krause anything?" as well as being inaccurate in itself because $3,000 was not what Krause paid for the car.

Respecting the actual payment of the $3,000, as distinguished from the agreement to pay it, Krause's story is this: The automobile which Krause had ordered in May, 1948, finally arrived at Sawyer's garage and was ready for delivery

March 19, 1949. Its list price was $3,000 but Krause had arranged for a $600 discount and he had made a down payment of $100. On March 19th Krause signed notes for $600 and $1,500, respectively, paid $300 cash, and took delivery. (We are using round numbers.) This transaction was completed with Sawyer's office manager. Sometime between April 15 and April 25, 1949, Sawyer paid Krause $1,500 in $20 bills. On April 25th Krause paid Sawyer $1,500 on his notes. Shortly before May 24th Sawyer paid Krause $1,500 more in cash, and on May 24, 1949, Krause paid Sawyer's manager $571.94, payment in full for his second promissory note.

Sawyer admits the financial arrangement on the car and Krause's payments to him as just stated, but denies that he made any payments whatever to Krause. However, the state introduced in evidence a check of $1,500 drawn by Sawyer on his business bank account on April 19th and another for $1,500 drawn May 18, 1949, which dates were just before Krause made the two payments on his notes. These checks were drawn to the order of Charles Geisenfeld, who was Sawyer's attorney and also a contractor, and were entered on the books as payment for repairs to the parking lot which Sawyer's business occupied and which was owned by the Schlitz Brewing Company. Geisenfeld did not run the checks through his own bank account but cashed them at the office of the county treasurer. Neither did Geisenfeld repair the parking lot. That was repaired and paid for by its owner. Geisenfeld had made certain minor repairs about the garage premises and had been paid for what he did by other checks. The inference is plain that Geisenfeld cashed the $1,500 checks as an accommodation to Sawyer and returned the cash to him and that was the money which Krause got from Sawyer a day or two later. The fictitious book entries were repeated as deductions in Sawyer's income-tax returns.

This evidence goes far to corroborate Krause,—we think sufficiently far,—and the false entries in the books of account throw great doubt on Sawyer's veracity. The jury is entitled to consider Krause's motives for perjury as appellant urges; therefore it must have the same right to recognize Sawyer's interest in the outcome of the case, and his motive to deny or distort transactions in which he took part.

Appellant submits that the admission in evidence of the two checks was error and that the proceeds were never traced from Geisenfeld to Krause. The voucher portion of each check showed that it was in payment for work which neither Geisenfeld nor his contracting firm had done. The evidence is that Sawyer was active in his business and on the business premises daily. He is chargeable with notice that the checks did not pay for what they purported to pay. The withdrawals from his business bank account are for amounts and at a time when there was already testimony before the court that such sums had been paid to Krause. We consider the check transaction is so closely connected with the payments Krause testified he received, and the inferences inevitably arising from a business procedure which appears on its own records to be so irregular, are so material that the trial court did not err in permitting the evidence to go to the jury for such corroborative value as the jury might place upon it.

The defendant in a criminal trial does not have to prove his innocence; it is for the state to prove his guilt beyond a reasonable doubt. Yet the evidence may be so incriminating and the explanation of it, if such explanation exists, so obvious and so available to the defendant that his failure to produce the explanation is a fair subject of comment. If Geisenfeld did not take back to Sawyer the $3,000 received when the county treasurer cashed Sawyer's checks it was a simple matter for him to say so. Yet Sawyer did not produce him to make the statement although he was Sawyer's friend,

attorney, and contractor. The prosecutor, however, did not comment on this until his rebuttal. Appellant then objected because he would have no chance to reply. The trial court sustained the objection and instructed the jury to disregard the comment. We consider no prejudicial error resulted.

Appellant contends that he did not have a fair trial because newspaper accounts reported the progress of the trial from day to day with what the papers evidently considered was informative comment on the events which took place in court. In these news stories it was frequently mentioned that Sawyer had previously been convicted on the same charges and the conviction reversed and a new trial ordered. The second trial consumed several days. The jurors were permitted to go home at night but were repeatedly admonished by the trial court not to read about the trial in the newspapers or listen to the radio reports of it. The appellant did not ask that the jury be confined. He does not specify that any juror disobeyed the instructions of the court, but he assumes such disobedience, as a matter of human nature, and insists that prejudice to him resulted. We do not think that appellant has shown enough to obtain a new trial on this ground. Counsel must have known from the first that the articles were being published and the jury had the opportunity to read them. We consider his failure to ask that the jury be confined was a waiver at least of the objection that the jury had opportunity to read and might do so notwithstanding the court's frequent admonitions. To support further objection at this time it should appear that some of the jurors did read accounts which were prejudicial to the defendant. There is no such showing here and the mere fact that prejudicial reports were published which did not come to the attention of the jury will not sustain counsel's present objection. *McHenry v. United States* (C. C. A. D. C. 1921), 276 Fed. 761, 34 A. L. R. 1109, 1112.

There are numerous other assignments of error ranging from rulings on the admissibility of evidence to the trial court's instructions to the jury. We have carefully examined them all without finding prejudicial error or even irregularity of sufficient moment to justify a longer opinion. We conclude that the trial was fair, the jury was properly and adequately instructed, and the evidence of guilt, if believed by the jury, was sufficient to sustain the verdict. The verdict was approved by the trial court. We must affirm the judgment.

*By the Court.*—Judgment affirmed.

* Motion for rehearing denied, without costs, on June 8, 1954.