*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

## STATE OF MINNESOTA
## IN COURT OF APPEALS
## A15-0494

In the Matter of the Welfare of the Child of: D. M. R., Parent

**Filed October 19, 2015**
**Affirmed**
**Peterson, Judge**

Hennepin County District Court
File Nos. 27-JV-14-1790 and 27-JV-13-7117

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, Minnesota (for appellant D.M.R.)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Eric S. Rehm, Rehm Law Office, Ltd., Burnsville, Minnesota (for respondent guardian ad litem Patricia Timpane)

Considered and decided by Smith, Presiding Judge; Peterson, Judge; and Larkin, Judge.

## UNPUBLISHED OPINION

**PETERSON**, Judge

The district court terminated appellant-mother D.M.R.'s parental rights, ruling that mother abandoned her child, failed to satisfy the duties of the parent-child relationship, and that the child is neglected and in foster care under Minn. Stat. § 260C.301, subd. 1(b)(1), (2), (8) (2014). On appeal, mother argues that (1) her religious beliefs and

mental health are not sufficient bases for terminating her parental rights, (2) she completed enough of her case plan to avoid termination of her parental rights, (3) the record does not show that the county's efforts to reunify the family were adequate, and (4) she did not abandon the child. We affirm.

## FACTS

The child was born in 2007. Mother became involved with a religious group. In June 2013, mother and two other members of the group left Minnesota for the western part of the United States. Mother left the child with other members of the group who stayed in Minnesota.

In September 2013, the police found two women and the child asleep in a van in St. Paul. The condition of the interior of the van suggested that they had been living in the van for some time. The women in the van told the police that they were "spiritual cleansers" and that mother was on a "spiritual journey." The child was later released to his maternal grandparents, who told the police that mother was "known to travel throughout the states, leaving [the child] behind." While away from Minnesota, mother called the group members with whom she left the child, but they would not let her speak with the child. Mother did not make other efforts to communicate with, or provide for, the child.

In September 2013, Hennepin County Human Services and Public Health Department (the county) filed a petition alleging the child to be in need of protection or services (CHIPS), and the child was placed in foster care. In November 2013, the district

2

court adjudicated the child CHIPS by default when mother did not appear at the CHIPS hearing. The CHIPS proceedings included a case plan for mother.

Also in November 2013, a child-protection worker contacted mother, who was in Oregon, and urged mother to return to Minnesota. Mother responded, saying that her spiritual work was at a "critical stage." Despite saying that she would return in December 2013, mother did not return until February 5, 2014.

On February 19, 2014, mother told the child-protection worker that mother would leave Minnesota. Mother was then hospitalized on a health-and-welfare hold from February 23-27, 2014, after the police found mother, delusional, at the airport looking for the "Blue Concourse" (which no longer exists). "[Mother] stated she was at the airport because the voices told her to follow the spirits" and she "wanted to go to San Francisco but did not know why." Mother was released from the health-and-welfare hold on February 27, 2014, and, by March 1, 2014, was on a train to the West Coast.

On March 25, 2014, the county petitioned to terminate mother's parental rights, asserting that mother had abandoned the child and had failed to satisfy the duties of the parent-child relationship and that the child was neglected and in foster care. Because the child was misbehaving after contact with mother, the district court, in April 2014, suspended contact between mother and the child.

Mother returned to Minnesota on June 4, 2014, and started work on her case plan, which included finding stable housing and establishing a relationship with the child. While working on her case plan between June 2014 and the start of the termination trial in November 2014, mother lived in a number of places. Mother "bounced all over

3

between July and September 2014[,]" and stated, at trial, that she had a permanent home in Lake Elmo, Minnesota.

While working on her case plan, mother completed a mental-health assessment by the county. It indicated that she was suffering from "Delusional Disorder, grandiose type, in remission." Mother chose to receive mental-health counseling with Robin Mahan, a therapist at Nystrom & Associates, Ltd. As the result of an October 2014 session between mother and the county's psychologist, the county proposed to the district court an order stating that "parent-child visits cease to begin at this time." Noting that it had reviewed the proposed order and received no opposition to it, the district court signed the proposed order.

Mahan then tendered a letter to the court indicting that mother was making sufficient progress in therapy to have contact with the child and, during trial, mother sought to have contact with the child restored. The district court denied that request.

Trial ended January 27, 2015, and included testimony that the child was "very bright," is in therapy for people who have post-traumatic-stress disorder and attachment dysfunctions, periodically had to go "dumpster diving" to get what he needed when he was living in the van, has made minimal progress in therapy because of a lack of permanency, does not want to talk about mother, and is regressing in therapy now that he knows that mother is back. Ultimately, in a detailed order that recounted the testimony of all witnesses and the procedural history of the case, the district court ruled that mother abandoned the child and failed to satisfy the duties of the parent-child relationship and that the child was neglected and in foster care. The court also ruled that termination of

4

mother's parental rights is in the child's best interests. The district court denied mother's

motion for a new trial or amended findings of fact, and mother appealed.

**D E C I S I O N**

When reviewing a district court's termination of parental rights, this court

> review[s] the district court's findings to determine whether
> they address the statutory criteria for termination of parental
> rights and are not clearly erroneous. Because termination of
> parental rights cannot be based on a statutory ground not
> included in the petition to terminate parental rights, we
> consider whether the district court's findings address only
> those statutory criteria for termination of parental rights
> alleged in the petition for termination of parental rights. A
> finding is clearly erroneous if it is either manifestly contrary
> to the weight of the evidence or not reasonably supported by
> the evidence as a whole. Nevertheless, we defer to the district
> court's decision to terminate parental rights. Therefore, if at
> least one statutory ground alleged in the petition is supported
> by clear and convincing evidence and termination of parental
> rights is in the child's best interests, we will affirm.

*In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008) (citations and quotations

omitted).[1] Mother challenges both the district court's findings of fact and its conclusion

that the child was neglected and in foster care.

**I.**

Mother argues that before she returned to Minnesota in June 2014, she was

controlled or influenced by the group, and that this fact must be taken into account when

---

[1] This court was greatly assisted by the district court's thorough, thoughtful, and detailed order. We note, however, that much of the order described the testimony, instead of stating findings of fact. *See Dean v. Pelton*, 437 N.W.2d 762, 764 (Minn. App. 1989) (stating that a recitation of the parties' assertions "may be helpful in understanding what the trial court considered" but that findings must be "affirmatively stated as findings of the trial court"); *see also Hassing v. Lancaster*, 570 N.W.2d 701, 703 (Minn. App. 1997) (applying *Dean*).

considering her actions before that time. The district court explicitly rejected the idea that the group controlled mother's conduct. This rejection of mother's argument is a determination that mother was not credible when she testified that her actions were the result of instructions from (or coercion by) the group. We defer to district court credibility determinations. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

## II.

Mother argues that the district court should not have based its decision to terminate her parental rights on either her religious beliefs or her mental health. As set out below, the district court did not base its decision on mother's religious beliefs or her mental health. To the extent that the district court considered these matters, it based its decision on the impact mother's beliefs and health had on her ability to provide for the child. This is consistent with caselaw. *See In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009) (noting that the district court considered a therapist's "favorable" testimony about a parent's parenting ability "in the context of previous findings regarding appellant-mother's mental-health issues and their impact on her children"); *In re Welfare of M.G.*, 407 N.W.2d 118, 121 (Minn. App. 1987) (noting that a child has a significant interest in the stability of her home and her health).

### A. Religion

At trial, mother's counsel commented that much of the trial had been about mother's "past beliefs" and her resulting "instability." The district court responded, stating that its focus was not on mother's religious beliefs but on "the instability that has ensued." Thus, the district court indicated both that mother's religious beliefs were not

critical to its termination decision, and that what actually concerned the district court was whether mother was able to provide a stable home for the child. And while the district court recited some of mother's beliefs in its order terminating parental rights, the order is unambiguously clear that the district court did not base its decision on mother's religious beliefs, but on the impact of those beliefs on mother's ability to adequately provide for the child.

### B.     Mental health

Mother admits that, when she was put on the mental-health hold in February 2014, she "may" have had the "Delusional Disorder" that the county diagnosed. Mother notes however, that when she was released from the hold, she was not prescribed anti-psychotic medications (which her therapist said would normally be the case for someone suffering from Delusional Disorder), and that, by the summer of 2014, multiple experts from the Nystrom office had concluded that she was not delusional. On this record, mother's lack of symptoms of Delusional Disorder, combined with treatment she received from Nystrom, undermine neither the diagnosis of Delusional Disorder nor the finding that mother was not adequately managing her disorder.

First, the district court found that both the child-protection worker and the county's psychologist testified that mother's "Delusional Disorder" was "in remission," and that even mother's chosen therapist (Mahan) was monitoring mother for Delusional Disorder and had not yet ruled out the idea that mother had that disorder. Consistent with the record, the district court also found that because Delusional Disorder is often cyclic in nature, it is not uncommon for persons with the disorder to "have periods of wellness and

periods of symptomology." Thus, any current lack of symptoms does not mean that mother does not have the disorder.

Second, the district court rejected Mahan's testimony that mother was "seeing a service provider [*i.e.*, Mahan and her associates at Nystrom] who properly addresses [mother's] significant mental health needs." The district court found that Mahan had only two sessions with mother before advocating for mother, and found "[Mahan's] testimony of little import on the question of whether [mother] has fully addressed her mental health issues, and ultimately, on whether the child could be returned to [mother]." *See State ex rel. Trimble v. Hedman*, 291 Minn. 442, 456, 192 N.W.2d 432, 440 (1971) (stating that appellate courts defer to a fact-finder's determination of weight and credibility of expert witnesses).

Third, as with mother's religious beliefs, the district court's order is clear that the district court did not base its decision to terminate mother's parental rights on any mental-health problems of mother. Instead, the district court was concerned with the impact of mother's mental health on her ability to provide a stable home for the child. This is consistent with caselaw. *See D.L.D.*, 771 N.W.2d at 545; *M.G.*, 407 N.W.2d at 121.

### III.

Mother argues that she satisfied much of her case plan. As set out below, however, the record supports the district court's determinations that mother failed to adequately complete the mental-health and stable-housing aspects of her case plan and

failed to improve her parenting to a point where her contact with the child would not have adverse consequences for the child.

The portions of the record mother cites to support her assertions that she satisfied certain mental-health aspects of her case plan refer to what she did at Nystrom generally, and with Mahan in particular. Because the district court discounted the testimony about the effectiveness of mother's work with Mahan and Nystrom, however, we reject mother's argument on this point. *See State ex rel. Trimble v. Hedman*, 291 Minn. 442, 456, 192 N.W.2d 432, 440 (1971) (stating that factfinder determines weight and credibility to be given to expert's opinion).

Mother asserts that she satisfied the stable-housing requirement. The district court order described in detail the testimony addressing the various states and places where mother lived between November 2013 and November 2014, including that mother "bounced all over" between July and September 2014. The district court found that "[mother's] issues with housing . . . are of grave concern to the Court and the [county.]" If the district court deemed mother's housing to be stable, her housing would not have been of concern. This implicit finding that mother's housing was not stable is consistent with the testimony cited above about the numerous places where mother lived, particularly in light of the fact that, on this record, the stability of mother's housing and her ability to pay for that housing are linked to her mental health. *See D.L.D.*, 771 N.W.2d at 545 (this court defers to a district court's implicit finding that certain testimony was not credible).

Mother correctly notes that she was not able to complete the visitation portion of her case plan because her access to the child was suspended. The district court noted this fact, and detailed mother's history of contact with the child as well as the district court's suspension of that contact. Thus, the district court was aware of the extent of mother's contact with the child, that there were multiple orders limiting that contact, and that the contact was limited because the contact had an adverse impact on the child. Absent mother's compliance with the mental-health and housing aspects of her case plan, mother has not shown that the district court erred by suspending mother's contact with a child for whom stability was important.

**IV.**

Mother challenges the district court's determination that the child is neglected and in foster care. *See* Minn. Stat. § 260C.301, subd. 1(b)(8) (reciting this basis for terminating parental rights). Mother notes that this basis for terminating parental rights requires the county to make reasonable efforts to reunite the family, and argues that, here, the county's reunification efforts were inadequate. Generally, "'[r]easonable efforts' at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007). "The quality and quantity of efforts to rehabilitate and reunify the family" are indicative of the efforts' reasonableness. *Id.* In assessing whether reasonable efforts were made, district courts consider whether the services were: "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate;

10

(4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). Mother alleges several reasons why the county's efforts were not reasonable.

## A. Visitation orders

Mother argues that the child's therapist "made the [ ] decision [not to allow mother to have contact with the child], not the court." When addressing whether the child was neglected and in foster care, the district court stated: "While [mother] has asked for visitation and/or contact, *the Court has found it has not been in the child's best interests since November 2014 and April 2014, respectively.*" (Emphasis added.) We decline to assume that the district court misrepresented who made the decision in question. Further, the district court made a similar decision regarding mother's ability to have contact with the child in its denial of mother's motion for visitation made during trial.

## B. Housing & employment

Mother asserts that the child's therapist lacked first-hand information regarding mother's housing and employment, and, therefore, the district court should not have relied on that part of her testimony. This is a challenge to the weight or credibility of witness testimony. Appellate courts "defer to the district court's determinations of witness credibility and the weight given to the evidence." *In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 413 (Minn. App. 2011) (citing *L.A.F.*, 554 N.W.2d at 396), *review denied* (Minn. July 28, 2011). Further, much of the district court's discussion of mother's housing is based on the testimony of the child-protection worker, not the testimony of the child's therapist. Thus, any erroneous admission of evidence from the

therapist on this topic is cumulative of other evidence in the record, and, therefore, is harmless. *See In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 93 (Minn. App. 2012) (concluding that any error in admission of challenged evidence was harmless because it was cumulative to other evidence, and, therefore, was not prejudicial).

### C.    Prior court orders

Mother argues that the county ignored for three months a June 2014 district court order that required mother's therapist and the child's therapist to meet and discuss mother's ability to have contact with the child. Mother contends that "[t]hese three months prolonged the mother-son separation for no good reason at all." But the June 2014 order does not mention mother's therapist, and states that the district court "will wait to hear from the child's therapist before it authorizes any visitation between [mother] and the child[.]" Thus, we reject mother's argument.

A September 17, 2014 order directed that mother's and the child's "therapists shall concur with each other and make recommendation regarding visits." Mother argues that the county "let another six or seven weeks go by after the September order." But mother does not explain how delaying a meeting between the therapists prolonged the mother-son separation when, as we have already addressed above, mother had failed to complete the mental-health aspect of her case plan.

### D.    Misleading the court

Mother argues that the county (1) "deliberately misled the court into signing a no-contact order in November 2014, based solely on [the child therapist's] recommendation made for the wrong reasons," (2) failed to inform the district court that mother "was

complying with her case plan," and (3) failed to inform the district court that mother's therapist "was recommending limited and closely supervised contact." Because this argument assumes that mother was complying with her case plan, and that any recommendations of mother's chosen therapist would be given weight by the district court, it is undercut by our rejections of those underlying assumptions.

### E. Neglected and in foster care

"Neglected and in foster care" means a child:

(1) who has been placed in foster care by court order; and
(2) whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and
(3) whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn. Stat. § 260C.007, subd. 24 (2014); *see* Minn. Stat. § 260C.163, subd. 9 (2014) (listing factors the district court is to consider when addressing whether a child is neglected and in foster care).

It is undisputed that this child was in foster care by court order. And, as set out above, mother's ability to adequately care for the child is undermined by both her currently unresolved mental-health challenges and the associated precariousness of her housing. Thus, the child cannot be returned to mother. Moreover, the record also shows that mother's inability to provide for the child persists because mother, despite the availability of rehabilitative services, left the state twice, and, when she returned to Minnesota,

13

made some, but ultimately insufficient, efforts to address the conditions that lead to her child's removal from her care. [Mother's] efforts were insufficient due chiefly to her long absence from the state, and her unwillingness or inability to accept responsibility for her own choices. [Mother] regularly did not put the needs of her child first.

The record amply supports these determinations by the district court, as well as the other findings the district court made regarding the factors it must consider when addressing whether a child is neglected and in foster care. This includes those factors addressed by the court that mother has not challenged in this appeal.[2] *Cf. In re Welfare of A.D.*, 535 N.W.2d 643, 648-49 (Minn. 1995) (affirming a determination that a child was neglected and in foster care despite district court's failure to specifically refer to each statutory fact when the district court's detailed findings of fact provide clear and convincing evidence of grounds for termination.) Thus, we affirm the district court's determination that this child is neglected and in foster care.

Because we conclude that the child is neglected and in foster care, we need not consider the other statutory bases for terminating mother's parental rights. *See* Minn. Stat. § 260C.317, subd. 1 (2014) (stating that the district court may terminate parental rights if it rules that "one or more of the [statutory bases for termination] exist").

**Affirmed.**

---

[2] For similar reasons, we affirm the district court's essentially unchallenged determination that termination of mother's parental rights is in the child's best interests.