# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2667-CR & 2015AP2668-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　　Plaintiff-Respondent,<br>　　v.<br>Gerrod R. Bell,<br>　　　　　Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 373 Wis. 2d 310, 895 N.W.2d 104
(2017 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 10, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 23, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Monroe |
| 　JUDGE: | Michael J. Rosborough |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | ZIEGLER, J. concurs (opinion filed). |
| 　DISSENTED: | A.W. BRADLEY, J. dissents (opinion filed). |
| 　NOT PARTICIPATING: | ROGGENSACK, C.J. withdrew from participation.<br>ABRAHAMSON, J. did not participate. |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by and an oral argument by *Suzanne L. Hagopian*, assistant state public defender.

For the plaintiff-respondent, there was a brief filed by *Daniel J. O'Brien*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Daniel J. O'Brien*.

2018 WI 28

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2015AP2667-CR & 2015AP2668-CR
(L.C. Nos. 2001CF239 & 2001CF249)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

  **Plaintiff-Respondent,**

  **v.**

**Gerrod R. Bell,**

  **Defendant-Appellant-Petitioner.**

**FILED**

**APR 10, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DANIEL KELLY, J. Gerrod Bell says he is entitled to a new trial because the first one, which resulted in convictions for the sexual assault of two victims, was unfair——a violation of his due process rights. He believes it was unfair because the State told the jurors they could not find him not guilty unless they thought the victims lied about the sexual assaults, and that they should not disbelieve the victims because there was no motive for them to lie. This, he says, shifted the burden of proof and distorted the jury's credibility determinations. He also claims the jury based its verdict, at least in part, on inadmissible evidence contained in two

exhibits sent to the jury room during deliberations. We conclude that Mr. Bell is not entitled to a new trial and affirm the decision of the court of appeals.[1]

## I. BACKGROUND

¶2 The State charged Mr. Bell with sexually assaulting two victims——T.P., who was fourteen years of age at the time, and her older sister, A.L., who was then seventeen. The incidents came to light when, in August of 2001, T.P.'s mother reported to Sergeant Dale Stickney of the Sparta Police Department that Mr. Bell, a family friend, had sexually assaulted T.P. in the backyard of T.P.'s home after a birthday party for A.L.

¶3 Detective LaVern Erickson and a social worker met with T.P. to interview her about the incident. Subsequently, Detective Erickson questioned A.L. about her sister's sexual assault. In the course of that interview, A.L. revealed to Detective Erickson that she had herself been the victim of three sexual assaults by Mr. Bell, all of which had occurred around the time of the incident with T.P.[2] Approximately five months

---

[1] This is a review of an unpublished decision of the court of appeals, State v. Bell, Nos. 2015AP2667-CR & 2015AP2668-CR, unpublished slip op. (Wis. Ct. App. Dec. 1, 2016), affirming the Monroe County Circuit Court's denial of Mr. Bell's postconviction motion. The Honorable Michael Rosborough presided over both the jury trial and the postconviction motion.

[2] It is somewhat unclear whether A.L. revealed all of this conduct during the course of a single interview with Detective Erickson; however, it appears that she reported these three incidents within approximately one to two weeks of T.P. having reported her assault.

after reporting these incidents, A.L. further disclosed that Mr. Bell had also sexually assaulted her in the bathroom of her mother's home in early July 2001—prior to the incidents she had previously reported and prior to the sexual assault of T.P. Of the four incidents, only the one occurring in the bathroom involved sexual intercourse.

¶4 The State initiated two cases against Mr. Bell, one for each of the victims, but joined them for trial.[3] With respect to T.P., the State charged Mr. Bell with one count of sexual assault as a persistent repeater contrary to Wis. Stat. §§ 940.225(2)(a) (2001-02),[4] 939.50(3)(bc), and 939.62(2m) (Count 1); one count of second-degree sexual assault of a child as a persistent repeater contrary to Wis. Stat. §§ 948.02(2), 939.50(3)(c), and 939.62(2m)(b)2. (Count 2); and one count of misdemeanor bail jumping as a repeater contrary to Wis. Stat. §§ 946.49(1)(a), 939.51(3)(a), and 939.62(1)(a) (Count 3). With respect to A.L., the State charged Mr. Bell with two counts of sexual assault as a persistent repeater contrary to Wis. Stat. §§ 940.225(2)(a), 939.50(3)(bc), and 939.62(2m) (Counts 1 and 2);[5] and two counts of attempted second degree sexual assault as

---

[3] Monroe County Circuit Court Case No. 2001CF239 (T.P.); Monroe County Circuit Court Case No. 2001CF249 (A.L.).

[4] All subsequent references to the Wisconsin Statutes are to the 2001-02 version unless otherwise indicated.

[5] Count 1 pertained to sexual contact without consent by use of threat or force and Count 2 pertained to non-consensual sexual intercourse with use of threat or by force.

3

a persistent repeater contrary to Wis. Stat. §§ 940.225(2)(a), 939.50(3)(bc), and 939.62(1)(c) (Counts 3 and 4). Before submitting the case to the jury, the circuit court dismissed Count 3 for lack of sufficient evidence, and then dismissed Count 4 at the State's request.

¶5 During deliberations, the jury requested that certain documents be delivered to it for review. Two of the documents indicated that T.P. had not had sexual intercourse until she was assaulted by Mr. Bell. Neither the prosecutor nor defense counsel asked for that information to be redacted from the exhibits.

¶6 The jury returned guilty verdicts on all counts submitted to it, and Mr. Bell received his sentence in due course. He then moved to vacate the judgments of conviction and requested a new trial pursuant to Wis. Stat. § (Rule) 809.30(2)(h) (2015-16)[6] on July 13, 2015.[7] His motion claimed he

---

[6] Wisconsin Stat. § (Rule) 809.30(2)(h) (2015-16) provides:

> Notice of appeal, postconviction or postdisposition motion. The person shall file in circuit court and serve on the prosecutor and any other party a notice of appeal or motion seeking postconviction or postdisposition relief within 60 days after the later of the service of the transcript or circuit court case record. The person shall file a motion for postconviction or postdisposition relief before a notice of appeal is filed unless the grounds for seeking relief are sufficiency of the evidence or issues previously raised. A postconviction or postdisposition motion under this section may not be accompanied by a notice of motion and is made when filed. A notice of appeal filed under this section

(continued)

4

did not receive a fair trial because: (1) the prosecutor's comments regarding motive and evidence of lying during closing argument shifted the burden of proof; and (2) the jury was allowed to view two inadmissible exhibits during deliberation.[8] As to his first argument, Mr. Bell argued he was entitled to relief based on the plain error doctrine or ineffective assistance of counsel, and as to his second argument, he sought relief based on the interests of justice or ineffective assistance of counsel. The circuit court conducted a Machner[9] hearing at which trial counsel testified. The court denied the motion because it concluded the trial was free from harmful

---

shall conform to the requirements set forth in s. 809.10.

[7] The procedural history in these cases is long, complicated, and but for the portions we have recounted, not relevant to the issues sub judice. For our purposes, it will suffice that the case is before us on direct appeal, notwithstanding the nearly 13 years between the verdict and Mr. Bell's postconviction motion.

[8] Mr. Bell also sought resentencing on Count 1 in the case related to T.P. (2001CF239). He asserted that if the court denied his request for a new trial, he was entitled to resentencing on this count because the persistent repeater had been incorrectly applied. The persistent repeater had also been applied incorrectly to Counts 1 and 2 in the case related to A.L. (2001CF249), which error was corrected in 2014. At the conclusion of the postconviction motion hearing, the circuit court agreed that resentencing on Count 1 in 2001CF239 would be necessary in the event the appellate courts upheld Mr. Bell's convictions. The resentencing issue is not currently before this court.

[9] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

5

error. The court of appeals affirmed, and we granted Mr. Bell's petition for review.

## II.  STANDARD OF REVIEW

¶7 Mr. Bell asks us to review the State's trial commentary under the plain error doctrine or, alternatively, for a determination that he received ineffective assistance of counsel. With respect to his attorney's failure to request redaction of the exhibits sent to the jury room, he asks us to determine only whether he received ineffective assistance of counsel.

¶8 The "plain error" Mr. Bell claims is at issue is a violation of his due process rights, which is a question of law we review de novo. State v. Burns, 2011 WI 22, ¶23, 332 Wis. 2d 730, 798 N.W.2d 166. However, we will not remedy errors under this doctrine unless they are "obvious and substantial[,]" and "so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." State v. Jorgensen, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77 (citation and internal marks omitted).

¶9 A claim of ineffective assistance of counsel presents a mixed question of fact and law. State v. Tourville, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735. We will not reverse the circuit court's findings of fact unless they are clearly erroneous. Id. We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel. Id.

6

III. DISCUSSION

¶10 Mr. Bell says his right to a fair trial was violated by: (1) the State's trial commentary, which he believes improperly shifted the burden of proof to him; and (2) the jury's review of certain unredacted documents during deliberations. We will address each issue in turn.

A. The State's Trial Commentary[10]

¶11 The essence of Mr. Bell's argument is that the State impermissibly shifted the burden of proof by framing this case as a binary proposition: The jury must convict him if it believes the victims, and may find him not guilty only if it does not.[11] Mr. Bell maintains there are other reasons the jury legitimately could have chosen to acquit him, and so the State's commentary misstated the law.[12] Because the defense did not move for a mistrial on that basis, this alleged error was not

---

[10] When we refer to the State's "trial commentary," we mean it to include comments and questions during voir dire, the opening statement, examination of witnesses, and closing arguments.

[11] Mr. Bell says the State compounded this error by also telling the jurors they should not believe the victims unless they could discern a reason for them to lie.

[12] Mr. Bell's brief purports to identify other reasons the jury could have acquitted him, but each one was just a different way of describing the jury's failure to believe the victims' testimony.

preserved for appellate review.[13] Mr. Bell says we should nonetheless reach and decide this issue under our "plain error" doctrine, or conclude that the failure to request a mistrial deprived him of the effective assistance of counsel during the trial.

¶12 The "plain error" doctrine allows us to review errors even when they were not properly preserved at trial. State v. Mayo, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115; see also Wis. Stat. § 901.03(4) (2015-16) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."). To qualify for this doctrine's application, however, the error "must be 'obvious and substantial[,]'" and "'so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.'" Jorgensen, 310 Wis. 2d 138, ¶21 (citation and one set of marks omitted). We employ this doctrine sparingly. Id.

¶13 We can also address unpreserved claims of error if the error is of such a nature that it deprived the defendant of "the

---

[13] See State v. Davidson, 2000 WI 91, ¶86, 236 Wis. 2d 537, 613 N.W.2d 606 (defendant who objects to a prosecutor's closing argument but fails to timely move for a mistrial waives his objection to the prosecutor's closing argument statements); State v. Huebner, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727 ("It is a fundamental principle of appellate review that issues must be preserved at the circuit court. Issues that are not preserved at the circuit court, even alleged constitutional errors, generally will not be considered on appeal.").

effective assistance of counsel." See Strickland v. Washington, 466 U.S. 668, 686 (1984). If the failure to move for a mistrial based on the State's trial commentary comprised deficient performance, and that deficiency was prejudicial, Mr. Bell would be entitled to a new trial. See id. at 687; State v. Pitsch, 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985).

¶14 There can be neither a deficiency nor plain error, however, unless the State's trial commentary was improper. Therefore, whether we analyze this case under the "plain error" doctrine or as an ineffective assistance of counsel claim, our first step is to determine whether the State's trial commentary was improper. If it was, our analysis would then turn to whether counsel's failure to request a mistrial: (1) was an error so obvious, substantial, and fundamental that a new trial is necessary; or (2) comprised deficient and prejudicial performance.

¶15 We begin with the fundamental tenet that Mr. Bell is guaranteed the right to due process of law. See U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."); Wis. Const. art. I, § 8 ("No person may be held to answer for a criminal offense without due process of law . . . ."). This guaranty extends to the State's comments during trial: "When a defendant alleges that a prosecutor's statements and arguments constituted misconduct, the test applied is whether the statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due

9

process.'" Mayo, 301 Wis. 2d 642, ¶43 (quoting State v. Davidson, 2000 WI 91, ¶88, 236 Wis. 2d 537, 613 N.W.2d 606) (some internal marks omitted); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986) (same).

¶16 These due process considerations do not, however, prevent the State from energetically pressing its case. The State's attorney is free to "prosecute with earnestness and vigor——indeed, he should do so." Berger v. United States, 295 U.S. 78, 88 (1935). But in conducting a trial, he must keep in mind that he represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Id. For that reason, "while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Id.

¶17 Mr. Bell says the State struck foul blows in his trial, the result of which was that he bore the burden of proving to the jury he was not guilty——a burden that does not belong to him. The burden to prove guilt beyond a reasonable doubt belongs to the State. Barrera v. State, 109 Wis. 2d 324, 329, 325 N.W.2d 722 (1982) (citing In re Winship, 397 U.S. 358 (1970)) ("The state bears the burden of proving all elements of a crime beyond reasonable doubt."); see also State v. Kuntz, 160 Wis. 2d 722, 736, 467 N.W.2d 531 (1991) ("It is axiomatic that

the State must prove all the elements of a crime beyond a reasonable doubt to convict a defendant."). Specifically, Mr. Bell says the State's comments throughout trial (including its closing argument) required the jury to convict him unless he could prove the victims lied about the sexual assaults and prevented the jury from questioning the victims' veracity unless it could divine a reason for them to lie.

¶18 We cannot, of course, look at the State's comments in isolation. We must examine them in the context of the entirety of the trial——including the nature of the defense Mr. Bell presented. It is fair to say that in evaluating Mr. Bell's claim, context is everything.

### 1. The Trial

¶19 To provide the proper context, we will recount, at length, the relevant parts of the trial proceedings. The purpose for doing so is to compare the State's commentary against the relevant facts and law. Our analysis will inquire into whether there is such a meaningful discrepancy between the two that it could have caused the jury to convict Mr. Bell without finding him guilty beyond a reasonable doubt. Mr. Bell says the State's improper commentary started with the examination of potential jurors, so we will begin there.

### a. Voir Dire

¶20 The prosecutor introduced the idea that people generally don't lie without reason early in the proceedings. He queried the prospective jurors closely on the truthfulness of teenagers and the reasons they might lie. For example, he asked

if any of the prospective jurors had "ever known a teenager to lie[,]" whether anyone had "ever not known a teenager to have lied[,]" and "what are some of the typical things you might expect a teenager to lie about?". After hearing from prospective jurors who acknowledged that teenagers likely do lie in some circumstances but are less likely to do so in others, the prosecutor asked:

> Would everybody agree here that——that, though, that if you're going to lie, you're going to have a reason like jealousy of some sort; there's going to be a reason why you would lie? Everybody agree with that? Everybody is nodding their head.

¶21 The prosecutor then asked "what are some reasons that a teenage girl might falsely accuse someone of sexual assault?" One juror responded that a teenage girl might lie for "attention," another answered "[l]ack of understanding of the gravity of accusing someone," another answered "revenge," and one prospective juror responded that teenage girls might lie about a sexual assault if they were afraid "that they'd get in trouble with their parents for having sex in the first place if they got caught." So the State asked the prospective jurors if they would "expect there would be some evidence that somebody would have a reason to lie? There would be some sort of evidence that this person would have a reason to lie about——[.]" Two prospective jurors responded that they would expect there to be some type of evidence that the person had lied. The State cautioned the prospective jurors they would hear jury instructions telling them that they would not be allowed to

speculate and that their verdict would need to be based on evidence or the lack of evidence.

¶22 The defense was similarly interested in the prospective jurors' impression of teenagers' truthfulness. After asking each prospective juror the ages of their children, he asked "How many people believe that a child 14 years old, 18 years old can——can lie about a sexual assault?" He then reminded the prospective jurors that the prosecutor had mentioned the concept of someone omitting certain details and asked if "anybody [has] heard of lying by omission?" He pursued this theme as he inquired into: (1) whether the jurors believed that someone might lie because she does not understand the repercussions; (2) whether someone might tell a lie and then continue telling the lie because it is too difficult to backtrack; and (3) whether someone might "lie to gain attention because they want the love and attention from that person[.]"

b. Opening Statements And Evidence Adduced at Trial

¶23 During his opening statement, defense counsel signaled that he would be concentrating on the victims' veracity. Part of his remarks referred to testimony that he said would establish T.P. had lied about the amount of alcohol she drank on the night of the assault, that she lied about the assaults having occurred, that A.L. had admitted prior to trial that she previously lied about how much alcohol T.P. consumed the night of the assault, and concluded by telling the jury that "the evidence will show at the end of this, that in fact . . . [T.P.] and [A.L.] did not know what the truth is."

13

¶24 Central to the State's case was the testimony of T.P. and A.L., who testified extensively and in great detail about the sexual assaults. T.P. not only recounted details of the actual assault, she also described the circumstances surrounding it. So, for example, she testified that on the day Mr. Bell sexually assaulted her, she had multiple alcoholic beverages and felt intoxicated at some point during the evening. T.P. then explained that when her mother asked her to go make sure the bonfire was out, Mr. Bell came out and sat on the picnic table with her. She then gave a moment by moment description of how Mr. Bell sexually assaulted her. She said that, afterwards, Mr. Bell demanded that she tell no one what he had done and warned her that if she did, it would happen again.

¶25 Mr. Bell's counsel questioned T.P. closely. Part of the cross-examination focused on potential motives for lying. So, for example, he obtained T.P.'s admission that she "ha[d]n't had the best life" and that she had received comfort and attention from her mother, and others, after reporting the assaults. He also took direct aim at her credibility, getting her to admit she had previously lied about the amount of alcohol she had consumed on the night of the assault and that——despite her earlier statements——she was, in fact, intoxicated at some point that evening. T.P. also confirmed she had previously lied regarding the extent of her knowledge about sexual matters, and defense counsel also identified other discrepancies between T.P.'s trial testimony and her previous statements.

14

¶26 A.L. provided testimony both about the evening her sister was assaulted and about her own assaults. With respect to T.P.'s assault, she said there was alcohol at her (A.L.'s) birthday party, that she (A.L.) had "a slight buzz," and that T.P. had been drinking, too, and was "kinda tipsy." A.L. said she (A.L.) left the party at some point with Mr. Bell and three other men and that they were "getting stoned," and she explained that after the group returned to the house around 7:00 p.m., she and one of the other men left again around midnight. When she returned shortly thereafter, she noticed a change in T.P.'s countenance and described her as seeming more sober and "off to herself."

¶27 A.L. also testified that she herself had been sexually assaulted by Mr. Bell on four occasions. She said three of the assaults occurred around the time Mr. Bell assaulted T.P. The fourth assault (the one she did not originally report to the police) involved sexual intercourse (unlike the other three events). She said she did not initially report this assault along with the others because she was "ashamed to talk about" it and "didn't want to remember it." Additionally, she said Mr. Bell had threatened to do the same thing to her sister if she told anyone what had occurred.

¶28 During his cross-examination of A.L., Mr. Bell's counsel focused on her credibility. He questioned her about discrepancies between her trial testimony and the statements she gave to police and her preliminary hearing testimony as to what occurred on the night Mr. Bell had non-consensual sexual

15

intercourse with her, and he also questioned A.L. about whether she had previously lied about how much alcohol she consumed on the night of T.P.'s sexual assault. A.L. confirmed she had previously lied about the amount she consumed because she was afraid of getting in trouble for drinking. A.L. also confirmed that after reporting the first three incidents involving Mr. Bell——which did not include sexual intercourse——she had lied to investigators when she told them that no other incidents had occurred. When asked whether her mother had been supportive of her after she had reported the fourth incident, A.L. confirmed that she had been and that her mother's support "was different" from what she had experienced in the past.

¶29 Dr. Ann Budzak, the pediatrician who examined T.P., also testified. She explained that although she performed a pelvic exam of T.P., she did not perform a forensic exam——which would include collecting specimens such as hair and semen if possible——because the exam occurred approximately five weeks after the alleged assault. Dr. Budzak further testified that based upon a reasonable degree of medical certainty, there was evidence that T.P. may have had sexual intercourse at some point because she had tolerated the pelvic exam and because there was a lack of hymenal tissue. She also testified, however, that a lack of hymenal tissue "is not specific or proof of having had a penetration experience such as sexual intercourse" and that although that was generally the most common explanation for its absence or disruption, "there are other ways hymenal tissue can be disrupted[.]"

16

¶30 Through cross-examination, defense counsel elicited that Mr. Bell had told the police he had not assaulted T.P. and A.L. In an attempt to bolster the credibility of this statement, defense counsel called Sergeant Stickney as a witness to recount Mr. Bell's offer to undergo a Computer Voice Stress Analysis. According to Sergeant Stickney, measuring the stress in an individual's voice can help in determining whether the person is telling the truth. However, Sergeant Stickney never followed up on Mr. Bell's offer to take the test. Defense counsel also attacked A.L.'s credibility by calling a private investigator to explain how the physical layout of the bathroom where A.L. said she had been sexually assaulted contradicted her testimony.

### c. Jury Instructions

¶31 Prior to closing arguments, the circuit court instructed the jury, in relevant part, as follows:

> Consider only the evidence received during this trial and the law as given to you by these instructions and from these alone, guided by your soundest reason and best judgment, reach your verdict.
>
> . . . .
>
> The burden of establishing every fact necessary to constitute guilt is upon the State. Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty.
>
> If you can reconcile the evidence upon any reasonable hypothesis consistent with the defendant's innocence, you should do so and return a verdict of not guilty.

17

The term "reasonable doubt" means a doubt based upon reason and common sense. It is doubt for which a reason can be given, arising from a fair and rational consideration of the evidence or lack of evidence. It means such a doubt as would cause a person of ordinary prudence to pause or hesitate when called upon to act in the most important affairs of life.

A reasonable doubt is not a doubt which is based on mere guesswork or speculation. A doubt which arises merely from sympathy or from fear to return a verdict of guilt is not a reasonable doubt. A reasonable doubt is not a doubt such as may be used to escape the responsibility of a decision.

While it is your duty to give the defendant the benefit of every reasonable doubt, you are not to search for doubt. You are to search for the truth.

¶32 The court defined evidence as: (1) "the sworn testimony of witnesses, both on direct and cross-examination"; (2) "exhibits the court has received"; and (3) "any facts to which the lawyers have agreed or stipulated or which the court has directed you to find." The court emphasized that the "[r]emarks of the attorneys are not evidence" and that while the jury should "[c]onsider carefully" the closing arguments, the attorneys' "arguments and conclusions and opinions are not evidence."

¶33 The court also identified the various factors the jury should consider in determining a witness's credibility and the weight to give the witness's testimony. Among the factors the court identified were "possible motives for falsifying testimony" and "all other facts and circumstances during the trial which tend to either support or to discredit the testimony." In doing so, the court instructed the jury to use

18

"your common sense and experience. In everyday life you determine for yourselves the reliability of things people say to you. You should do the same thing here."

#### d. Closing Arguments

¶34 As the prosecutor commenced his closing argument, he reminded the jurors of the instructions they had just heard. He then reprised the theme of his case: The jury shouldn't return a verdict of "not guilty" unless it believed T.P. and A.L. had lied:

> I think it's interesting to start from this point of view. What must we believe, what things must we believe for the defendant to be not guilty? After hearing all the evidence that we've heard, what are the things that we must believe true if he is not guilty?
>
> First of all, when it comes to [T.P.], who's 13 [sic], that she first lied to Sergeant Stickney about the defendant raping her. We have to believe that she then proceeded in the videotape that occurred over two days——one of those videotapes we saw, the first one—— that she then lied to the social worker . . . about the rape. That the defendant, when the defendant assaulted her.
>
> We then have to believe that she lied to us. You have to believe that.
>
> We have to then believe when we look at [A.L.] and her testimony, we would have to believe if the defendant is not guilty, that she first lied to Detective LaVern Erickson when she told him about the incident on the couch when the defendant held her down and grabbed her breast. And that the first thing that she came forward with.
>
> The other instances when they were investigating the night of the party, we have to believe she lied about that.

At that point, trial counsel objected; however, the circuit court overruled the objection and the prosecutor resumed his argument:

> We must believe that she [A.L.] lied to Detective LaVern Erickson about that. We must believe then six months later, for some reason, she just decided to pile on another story and that she lied to Sergeant Stickney when he said there was a pool of tears, there was a wet spot there when she got done testifying——or telling him about the rape in the shower on July 2d. We have to believe that she lied about that.
>
> And we have to then believe that she lied at the preliminary hearing back in February of this year when she had to discuss both of those instances.
>
> We have to believe that she lied to us over the course of two days when she was up there for a number of hours, that she intentionally lied to us this week. That's what we'd have to believe.

The prosecutor further argued that, to believe T.P. and A.L. were lying, the jury would have "to believe that those two girls, [A.L. and T.P.] are simply two of the best actors——or actresses we have ever seen. Could Meryl Streep have done any better? The reason their testimony is so compelling is because they weren't acting."

¶35 The prosecutor encouraged the jurors not to disbelieve the victims unless they found a motive to lie. He said that "if somebody is going to lie about something, they're going to have a reason. They're going to have some evidence of that reason." He argued that in this case, however, defense counsel had "no idea" why A.L. and T.P. might lie and that because he had no idea, he "just begins to speculate. He just begins to make guesses after he says he has no idea why [T.P.] would make this

20

up." The prosecutor further argued that "[i]f a person lies about something, they must have a reason. And the reason why there is no evidence in this case about why anybody would lie is because they're not lying. [T.P.] and [A.L.] are not lying."

¶36 Defense counsel's closing argument focused exclusively on whether T.P. and A.L. should be believed. He argued that the police had not thoroughly investigated T.P.'s and A.L.'s allegations and that "much like the Salem Witch Trials of 1962 (sic), certain people were believed and that was it, that was all that was necessary. And apparently, unfortunately—unfortunately for [Mr.] Bell, that it was assumed that the girls were telling the truth." Trial counsel also juxtaposed A.L.'s testimony about the layout of the bathroom where one of the sexual assaults occurred with the testimony of the private investigator Mr. Bell hired to argue that A.L. had been lying and that she had "change[d] her story." Defense counsel's argument became even more pointed, asserting that "it [the sexual assaults] never happened. The reason why it doesn't make sense is it just didn't happen." Revisiting each of the victim's allegations, he told the jury "[t]his never happened" or "[i]t didn't happen."

¶37 Defense counsel also told the jury that A.L. and T.P. had ample motive to lie. He explained that in light of their "difficult life," "lying becomes easy" and eventually turns into "a way of survival." In regard to T.P., defense counsel argued that she had

21

learn[ed] that she can manipulate what happens to her, she can manipulate not going to school, she can manipulate trying to get closer to mom and so lying becomes an easy thing. Lying can be a daily event for an individual like that, like protecting others, protecting themselves, can be a cry for attention, so I don't have to do something such as go to school, so they'll allow me to do something.

Lying can be out of jealousy, lying can be out of hurt, lying can be for revenge and a lie is out of control. And that's what's happened here. The lies have become so deep and so out of control that you can't bring it back. You can't expose what the truth is and that the truth that this never happened; you can't because you would be the scorn of all. And in fact, maybe her actions tell you so much by saying I don't want to pursue this thing.

Defense counsel further argued:

That's what this is all about; a life where lies don't mean anything, they don't mean anything to these girls because they've had to live that life the entire time. It's a way to protect themselves, it's their shield. And so it's easy for them that they can look you in the eye and I'm not lying, no, it was one wine cooler. . . .

 . . . .

They put on a mask. He——[the prosecutor] talks about Meryl Streep and great actresses. They've had to act their whole life;  . . . . They're crying for help; it's easy to act.

¶38 On rebuttal, the prosecutor dismissed defense counsel's theories about why A.L. and T.P. might lie as "[p]ure speculation, pure speculation, pure speculation" and argued that there simply was "no testimony that they were lying. There's no evidence that they were lying." The prosecutor also told the jurors that the jury instructions precluded them from speculating and engaging in "sheer guesswork."

2.    Propriety of the State's Trial Commentary

¶39 Although there are boundaries on what prosecutors may say during trial, we leave them plenty of room to address the facts and law. "Counsel is allowed considerable latitude in closing arguments, with discretion given to the trial court in determining the propriety of the argument." State v. Burns, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166.  A "prosecutor may comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors." State v. Draize, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979) (citation and internal marks omitted).  "The prosecutor should aim to 'analyze the evidence and present facts with a reasonable interpretation to aid the jury in calmly and reasonably drawing just inferences and arriving at a just conclusion upon the main or controlling questions.'"  Burns, 332 Wis. 2d 730, ¶48 (quoting Draize, 88 Wis. 2d at 454).  But a prosecutor cannot suggest that the jury consider facts not in evidence.  Burns, 332 Wis. 2d 730, ¶48.

¶40 Because people are endlessly inventive, and each trial is unique, it is impossible to describe in detail the outer parameters of proper trial commentary.  However, based on what we said in Draize and Burns, we may conclude that those boundaries extend at least far enough to encompass fair characterizations of the law and the state of the evidence.  If the prosecutor steps across the permissible boundary, we must then determine whether the incursion is so significant (either alone or in combination with other infractions) that it renders

23

the entire trial unfair. "When a defendant alleges that a prosecutor's statements constituted misconduct, the test we apply is whether the statements so infected the trial with unfairness as to make the resulting conviction a denial of due process." Davidson, 236 Wis. 2d 537, ¶88 (internal marks and citations omitted); see also State v. Hurley, 2015 WI 35, ¶96, 361 Wis. 2d 529, 861 N.W.2d 174 (quoting Mayo, 301 Wis. 2d 642, ¶43) ("'[T]he [challenged] statements must be looked at in the context of the entire trial.'").

¶41 With that context, we are now prepared to assess Mr. Bell's claim that the State's comments deprived him of the due process of law. Mr. Bell says the improper commentary fell into two categories. The first comprised the prosecutor's statements that the jurors had to believe T.P. and A.L. were lying before they could find him not guilty (the "must believe" statements). The second category contained those statements in which the prosecutor claimed that people generally do not lie without reason, and that if the victims had no motive to lie, they should be believed (the "motive" statements). Mr. Bell has not identified any Wisconsin case addressing the propriety of statements of this nature, nor have we found any. So we will resolve this matter by drawing on the general principles enunciated above and the wisdom we find in other jurisdictions.

a. The "Must Believe" Statements

¶42 As is apparent from our recitation of trial highlights, the prosecution and defense theories of the case were mirror-images: The prosecution said T.P. and A.L. were

24

telling the truth, the defense said they were not. But they agreed that the resolution of that contest would decide the case. The prosecutor said it would be improper for the jury to find Mr. Bell not guilty unless the victims lied, while the defense said such a finding was necessary because they did.

¶43 Mr. Bell pursued a reasonable, but narrowly focused strategy. He did not argue that T.P. and A.L.'s description of events failed to satisfy the statutory elements of the crimes with which he was charged. He did not argue mistaken identity or assert that someone else bore responsibility for the assaults. He did not argue the actions had been misconstrued. He said they never happened. The only evidence he adduced at trial related to the victims' credibility, and all of his efforts went into showing that T.P. and A.L. could not be believed. Through comments in voir dire, the outline of the case provided in opening statements, the examination of witnesses, and closing arguments, the defense offered the jury one reason, and one reason only, for acquitting him——to wit, the untruthfulness of the victims. This is not just our characterization of the record, it is Mr. Bell's own description of his defense strategy: "The entire defense was aimed at establishing reasonable doubt in the jurors' minds about the sisters' accusations, by vigorous cross-examination of A.L. and T.P. to establish inconsistencies and to show that they had been encouraged by their mother to lie about T.P.'s drinking."

¶44 Consequently, we must determine whether there is any meaningful distinction in this case between the defense's

25

assertion that the jury must find Mr. Bell not guilty because the victims lied and the prosecution's argument that the jury may not make such a finding unless they did. This is not just a quibble over semantics. The two propositions implicate the logical distinction between those conditions that are "sufficient" to reach a conclusion versus those that are merely "necessary" (but not sufficient).

¶45 An example of the latter condition would be a case in which the victim is the sole source of evidence for some (but not all) of the elements of the crime. In that situation, her testimony is necessary to convict the defendant, but not sufficient——the State must still present evidence in support of the remaining elements from other sources. Viewing the same scenario from the defendant's perspective illustrates the asymmetrical nature of "sufficient" conditions. It is sufficient for an acquittal that he convince the jury not to believe the victim, because that negatives the elements of the crime for which she was the sole source of evidence. But it is not <u>necessary</u> for the jury to disbelieve the victim, because (in this example) there were other elements of the crime the State had to establish, and the jury could legitimately conclude the State failed to do so. The logical prerequisites for each party's success are asymmetrical because it is <u>necessary</u> for the State to succeed with respect to each element, while it is <u>sufficient</u> for the defense to succeed with respect to just one. In this category of cases, the State may not suggest the jury should not return a verdict of "not guilty" unless it concludes

26

the victim lied.  Such a suggestion would be an improper shifting of the burden of proof because although the victim's untruthfulness was a sufficient condition for acquittal, it was not necessary.

¶46 There is a different category of cases, however, in which the logical prerequisites for each party's success are symmetrical.  This category comprises situations in which, for example, the State need only prove the truth of one condition to obtain a conviction.  From the State's perspective, that condition is both necessary and sufficient.  Unlike the prior category of cases, the defendant's perspective is the mirror image——an acquittal is not possible unless that one condition is not true.  That is to say, it is not just sufficient that the one condition be untrue, it is also necessary.

¶47 Mr. Bell presents us with just such a case.  Here, that one condition was whether the victims were telling the truth.  If they were, their testimony satisfied all of the elements of the crimes with which Mr. Bell was charged.  Therefore, the only way Mr. Bell could have won an acquittal would have been to falsify that condition——that is, convince the jury that the victims lied.  Mr. Bell offered the jury no weakness in the State's case other than the victims' credibility.  Even now, he does not tell us how (absent jury nullification) the jury could have acquitted him if it nonetheless believed the victims.  And jury nullification is not an option——there is no right to have the jury disregard the law or evidence.  State v. Bjerkaas, 163 Wis. 2d 949, 960, 472

27

N.W.2d 615 (Ct. App. 1991) (the defendant has no "right to have a jury decide a case contrary to law or fact, much less a right to an instruction telling jurors they may do so or to an argument urging them to nullify applicable laws."); see also United States v. Kerley, 838 F.2d 932, 938 (7th Cir. 1988) ("It [the jury] has the power to acquit on bad grounds, because the government is not allowed to appeal from an acquittal by a jury. But jury nullification is just a power, not also a right . . . .") (emphasis omitted); Strickland, 466 U.S. at 695 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.") (analyzing prejudice under ineffective assistance of counsel).  Therefore, the jury's resolution of the case had to follow its conclusion regarding the victims' veracity.

¶48 The authorities Mr. Bell cited do not persuade us because they are not in the same logical category as this case. In United States v. Vargas, 583 F.2d 380 (7th Cir. 1978), for example, the prosecution's case depended not just on the witnesses' honesty, but also on the accuracy of their observations and the inferences they concluded from them.  As the Seventh Circuit later characterized that case, the

28

prosecutor's error was in telling the jury there was only one way to reach acquittal, when in fact the evidence gave them other paths to that end:

> Not content to let the jury decide the case according to the judge's instructions, he set up a "false dilemma" by informing the jury that they had to choose between two and only two options——either the defendant was lying or all the federal agents were lying——when in fact the jury had more options than only those two . . . ."

United States v. Amerson, 185 F.3d 676, 687 (7th Cir. 1999) (citing Vargas, 583 F.2d at 387).

¶49 The prosecutor's argument in United States v. Cornett, 232 F.3d 570 (7th Cir. 2000), suffered the same deficiency as the one in Vargas. The Cornett jury could have acquitted the defendant on the charge he unlawfully possessed a firearm if it concluded that what the law enforcement officer observed did not amount to possession of a firearm. Because the jury could acquit without believing the officer had lied, the prosecutor's statement to the contrary was error. Likewise, the defendant in United States v. Reed, 724 F.2d 677 (8th Cir. 1984), faced multiple counts of wire fraud in which the State's case relied not just on the honesty of its witnesses, but the rational inferences one could derive from their testimony. Therefore, it was error for the prosecutor to argue that the jury could acquit only if the jury "determine[s] that [the defendant] is telling the truth and that all [the government witnesses] are lying to you." Id. at 681. As in Vargas and Cornett, the jury could have believed the witnesses but acquitted anyway because they

29

did not agree with the conclusions the witnesses drew from what they observed.[14]

¶50 We see support for the propriety of the prosecutor's trial commentary in the principles described in Amerson and United States v. Sandoval, 347 F.3d 627, 631-32 (7th Cir. 2003). In Sandoval, the prosecutor said "'Well, you would have to conclude that the police officers were not telling the truth if you're going to accept the defendant's testimony.'" Id. at 632. The court said this was in the nature of "ask[ing] the jury to

---

[14] Most of the other cases on which Mr. Bell relies are not in the same logical category as his because they describe circumstances in which the jury could have acquitted the defendant based on something other than the witness's untruthfulness. See, e.g., United States v. Richter, 826 F.2d 206 (2nd Cir. 1987) (prosecutor's argument that jury could determine defendant was "not telling . . . the truth" because that would mean the two FBI agents had "committed perjury" was "patently misleading" because resolution of the "fundamental issue" did not "hinge[] upon the veracity of the FBI agents."); State v. Albino, 97 A.3d 478 (Conn. 2014) (despite concluding defendant was not deprived of a fair trial, prosecutor's argument that jury would "have to find that every single person in this case is wrong" in order to find defendant not guilty precluded jury from reaching reasonable reconciliations of conflicting testimony); People v. Dace, 604 N.E.2d 1013 (Ill. App. Ct. 1992) (court explained that "the jury could have believed some of the witnesses and still have believed defendant's testimony that he did not sexually assault L.R."); State v. Graves, 668 N.W.2d 860 (Iowa 2003) (prosecutor's statement that if the jury believed the officer's testimony then "there is no question [defendant] is guilty as charged" was improper because even if jury believed officer's testimony regarding defendant's residency, defendant's "residency alone would not support a guilty verdict on the possession-with-intent-to-deliver charge."). The remaining cases Mr. Bell cited provide insufficient information for us to identify the logical category into which they would fit.

weigh the credibility of the witnesses." Id. Similarly, in Amerson, the prosecutor said the jury couldn't "'believe the testimony of these police officers and believe the defendant's testimony at the same time.'" 185 F.3d at 680. The Amerson court said this was "a mere statement of fact, which was no different than stating to the jury that they had a chance to determine whether the officers or the defendant was telling the truth and that it was up to the jury to determine who was more credible when applying the . . . jury instructions . . . ." Id. at 687.

¶51 The key to both Amerson and Sandoval is that when the prosecutor's statements are fairly characterized as impressing on the jury the importance of assessing the witnesses' credibility, there is no error. That is the practical effect of the prosecutor's commentary in this case. The parties did not offer competing story lines, nor did the defense advance an alternative version of the events described by T.P. and A.L. There was the truth of the events the victims described, or the lack of truth. The verdict would necessarily follow the option chosen by the jury. Therefore, because Mr. Bell is in the category of cases in which the verdict will necessarily follow the jury's determination of the victims' credibility, the State's argument that the jurors should not find Mr. Bell not guilty unless they conclude T.P. and A.L. lied is equivalent to asking the jurors to carefully weigh the victims' credibility.

¶52 We conclude that the State's "must believe" commentary was not improper; that does not, however, end our inquiry, as we

31

must also consider whether the prosecutor's "motive" statements were improper.

### b. The "Motive" Statements

¶53 Mr. Bell characterizes the prosecutor's "motive statements" as instructing the jury that it could not disbelieve the victims unless there was evidence of a motive for them to lie. We do not believe this fairly characterizes the nature of these statements. Taken as a whole, the prosecutor was undoubtedly encouraging the jurors not to disbelieve the victims unless they found evidence of a motive to lie. But such an argument is in an entirely different category from an assertion that they cannot disbelieve the victims without such evidence. The first category comprises persuasion, while the second relates to purported statements of the law.

¶54 Both the prosecutor and defense counsel spent time during voir dire questioning prospective jurors about the reasons a person might lie. Defense counsel used cross-examination to suggest some motives for lying, including a desire for parental attention and sympathy, and avoiding responsibility for misdeeds. The statements that come closest to Mr. Bell's claim of error took place during closing arguments. There, the prosecutor made statements such as "if somebody is going to lie about something, they're going to have a reason. They're going to have some evidence of that reason." Additionally, he argued that "[i]f a person lies about something, they must have a reason. And the reason why there is no evidence in this case about why anybody would lie is because

32

they're not lying." Defense counsel responded by describing various reasons the victims might have lied, including jealousy, hurt, revenge, and a perceived need for survival. The prosecutor, during rebuttal, told the jurors that defense counsel was inviting them to speculate about the motives to lie and that the jury instructions say they must not speculate.

¶55 We agree with the court of appeals that it is a matter of general life experience that people normally do not lie without reason: "It is common sense that people do not lie unless there is a reason behind the lie. That is, at least ordinarily, and arguably by definition, a lie is the result of a decision to convey a falsehood." State v. Bell, Nos. 2015AP2667-CR & 2015AP2668-CR, unpublished slip op., ¶32 (Wis. Ct. App. Dec. 1, 2016). All but one of the prosecutor's "motive" statements consist of observations about this common-sense principle and an encouragement not to discard it as they weighed the victims' credibility. That is, the comments fell into the category of persuasion.

¶56 The one comment that fell into the "statements of law" category was the prosecutor's admonition that the jury instructions did not allow the jurors to speculate with respect to a witness's credibility. Mr. Bell says they may, and directs our attention to the jury instruction's description of what may be considered in weighing a witness's credibility:

> It is the duty of the jury to scrutinize and to weigh the testimony of witnesses and to determine the sole effect of the evidence as a whole. You are the sole judges of the credibility, that is, the

33

believability, of the witnesses and of the weight to be given to their testimony.

In determining the credibility of each witness and the weight you give to the testimony of each witness, consider these factors: whether the witness has an interest or lack of interest in the result of this trial; the witness' conduct, appearance, and demeanor on the witness stand; the clearness or lack of clearness of the witness' recollections; the opportunity the witness had for observing and for knowing the matters the witness testified about; the reasonableness of the witness testimony; the apparent intelligence of the witness; bias or prejudice, if any has been shown; possible motives for falsifying testimony; and all other facts and circumstances during the trial which tend either to support or to discredit the testimony. Then give to the testimony of each witness the weight you believe it should receive.

There is no magic way for you to evaluate testimony; instead, you should use your common sense and experience. In everyday life you determine for yourselves the reliability of things people say to you. You should do the same thing here.

¶57 This instruction does not suggest the jury may speculate about witness credibility. It gives examples of considerations that may affect the jurors' judgment about the witness's credibility, amongst which are the possible motives for falsifying testimony, and "all other facts and circumstances" that "either support or discredit the trial testimony." This is not an invitation to speculate, nor does it endorse the creation of discrediting evidence ex nihilo. As in all other aspects of the case, the jury must consider the witnesses' testimony in light of the admissible evidence and reasonable inferences, all as directed by their "common sense and experience."

34

¶58 Mr. Bell says our decision in Vill. of Bangor v. Hussa Canning & Pickle Co., 208 Wis. 191, 242 N.W. 565 (1932), recognizes the jury's right to speculatively discount a witness's credibility. There, we observed that "[i]n a jury trial there are a great many factors, some of them very subtle, which, consciously or unconsciously, influence the juror's mind in judging the credibility of witnesses and resolving the merits of the case." Id. at 198. True enough, but just because the evidence's effect is subtle does not make the jurors' response to it a matter of speculation.

¶59 The prosecutor did not shift the burden to Mr. Bell by encouraging the jury not to discount the victims' testimony in the absence of a motive to lie. This was persuasion, not a statement of the law. Nor was his admonition that the jurors must not speculate, even with respect to matters of credibility, erroneous. Consequently, having determined that neither the "must believe" nor the "motive" statements were improper, Mr. Bell has identified no error to which we may apply the "plain error" doctrine, and no cognizable deficiency in his counsel's performance at trial. That necessarily means we need not consider whether, if they had been improper, it would have been so obvious, substantial, and fundamental that it would necessitate a new trial under our "plain error" doctrine. It also means Mr. Bell's counsel could not have performed deficiently (on this issue) because Mr. Bell would not have been entitled to a mistrial even if he had requested it. See, e.g., Strickland, 466 U.S. at 687 (to prove deficiency, defendant must

35

establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

### B. The Jury's Review of Unredacted Exhibits

¶60 Mr. Bell's final challenge to his convictions is that his trial counsel was ineffective for failing to seek redaction of information from two of his exhibits that suggested T.P. had not been sexually active prior to the assault. The statements at issue are brief. Mr. Bell's challenge to the first exhibit——a transcript of T.P.'s taped statement to Sergeant Stickney——relates to the following exchange:

> [Sergeant Stickney]: "Had you ever had sex before that point?"
>
> [T.P.]: "No."

As to the second exhibit, Sergeant Stickney's written report recounting the interview with T.P., Mr. Bell challenges the following commentary:

> She is 14 years old but seemed to have very little knowledge about sex. She had told me she had never had sex before.
>
> She also could not say if he ejaculated or even if she knew what that meant. I tried to explain and she said she did not think he did but was not sure.

¶61 The Sixth Amendment[15] guarantees to a criminal defendant "the effective assistance of counsel." Strickland, 466 U.S. at 686. A successful attack on counsel's performance

---

[15] See U.S. Const. amend. VI; Wis. Const. art. I, § 7.

requires that the defendant establish both that trial counsel performed deficiently and that the deficiency was prejudicial. See Pitsch, 124 Wis. 2d at 633; see also Strickland, 466 U.S. at 697.

¶62 The first prong requires us to compare counsel's performance to the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Only if his conduct falls outside that objectively reasonable range will we conclude that counsel performed deficiently. State v. Thiel, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. To show prejudice (the second prong), a defendant must establish "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Pitsch, 124 Wis. 2d at 642 (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A lack of confidence arises when "'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) (quoting Strickland, 466 U.S. at 687). If the defendant fails to prove one element, it is unnecessary to address the other. Strickland, 466 U.S. at 697.

¶63 Mr. Bell says the two documents at issue contained evidence made inadmissible by Wis. Stat. § 972.11(2)(b) (the "Rape Shield" statute), which precludes admission of "any evidence" of the complainant's "prior sexual conduct." Prior sexual conduct includes a lack of sexual conduct, meaning that

37

evidence that a complainant had never had sexual intercourse is inadmissible. State v. Gavigan, 111 Wis. 2d 150, 159, 330 N.W.2d 571 (1983). This prohibition extends to indirect references to a complainant's lack of sexual experience or activity. Id. Evidence of this nature is prohibited because it "is generally prejudicial and bears no logical correlation to the complainant's credibility." Id. at 156. The rule applies to adolescents as well as adults. See State v. Mitchell, 144 Wis. 2d 596, 601, 424 N.W.2d 698 (1988).

¶64 Both the prosecutor and defense counsel had the opportunity to review the requested exhibits and to redact them as they saw fit before they went to the jury room. Defense counsel and the prosecutor agreed to redact information from exhibits other than the ones at issue. Defense counsel did not, however, seek redaction of the exhibits about which Mr. Bell is now concerned. At the December 2015 Machner hearing, defense counsel could not specifically recall why he did not seek redaction of these exhibits and speculated that he believed the unredacted statements would bolster the inconsistencies in T.P.'s testimony.

¶65 We agree with Mr. Bell that these exhibits should not have been submitted to the jury without redaction. It is well-established that the type of information Mr. Bell challenged is generally inadmissible, and defense counsel acknowledged as much at the Machner hearing, stating that he may have "goofed up" in not requesting redaction. Defense counsel's attempt to explain his possible rationale for failing to do so was hampered by the

38

passage of time——13 years between the trial and the Machner hearing.  The result is that we have insufficient information to conclude that there was no deficiency in defense counsel's performance.[16]  For the sake of the remaining analysis, therefore, we will assume——without deciding——that his performance was deficient.

¶66 To succeed with his challenge Mr. Bell must also establish that the deficient performance was prejudicial.  We conclude the circumstances do not support such a conclusion.

¶67 Mr. Bell primarily argues that the unredacted information was prejudicial because it "was likely to arouse sympathy for [T.P.] and undercut defense counsel's contention that she was uncooperative because the assault never occurred" and that in light of Dr. Budzak's testimony regarding T.P.'s lack of hymenal tissue, evidence that T.P. "had not had sexual intercourse until she was assaulted by [Mr.] Bell undermines confidence in the outcome."  This lack of confidence, Mr. Bell says, arises because the combination of Dr. Budzak's testimony and the inadmissible evidence "created a strong inference that, because [T.P.] had never before had intercourse, the destruction

---

[16] Our review of the record confirms that defense counsel was aware of the Rape Shield statute at the time of trial, at least generally speaking:  On the second day of trial, prior to reprising A.L.'s testimony, he sought permission to address A.L.'s prior sexual conduct on cross-examination despite being aware that the "Rape Shield exists . . . ."  The court ruled that it would not allow him to do so based on the Rape Shield statute.

of her hymen occurred during the only time she had intercourse, and that was the assault by Bell." We disagree.

¶68 The connection between Dr. Budzak's testimony and the statements at issue——that T.P. had not had sexual intercourse prior to the sexual assault——was not the subject of argument, and neither the prosecutor nor trial counsel drew any such connection for the jury. Moreover, careful review of Dr. Budzak's trial testimony weakens Mr. Bell's argument. While Dr. Budzak did testify that based on T.P.'s exam "[i]t would be likely" that T.P "had had sexual intercourse" at some point in her life and that her conclusion was based on T.P.'s "lack of hymenal tissue and her ability to tolerate the exam easily[,]" she also explained that because approximately five weeks elapsed between the assault and the exam, there simply was no way to confirm that the sexual intercourse was the result of a sexual assault. She likewise did not confirm whether it is possible to pinpoint when the hymenal tissue became disrupted. Moreover, Dr. Budzak explained that a lack of hymenal tissue does not conclusively prove an individual has had sexual intercourse because there are other explanations as to why that tissue is absent or disrupted. Therefore, the fact that the physical exam indicated T.P. may have had sexual intercourse at some point in her life does not necessarily establish that she did have sexual intercourse. And even if this established that she had had sexual intercourse, it is entirely incapable of identifying with whom she had it. Nor can it even establish that the hymenal tissue was disrupted as a consequence of the sexual assault, as

40

opposed to sexual intercourse prior to that date, or during the five weeks between that date and the examination. Therefore, this evidence does not make it any more likely that the sexual intercourse—assuming it occurred—was with Mr. Bell.

¶69 At best, Mr. Bell posits that the jury—without any prompting by trial counsel or the prosecutor—may have drawn a connection between Dr. Budzak's testimony and the inadmissible evidence. This is too speculative to conclude that Mr. Bell suffered any prejudicial effect at all, particularly because Dr. Budzak's testimony and the exhibits at issue pertained only to T.P. and said nothing of A.L.'s assault. This error was not so serious that it deprived Mr. Bell of a fair trial, so it does not shake our confidence in the outcome. Therefore, although it was error for the jury to view the statements alluding to T.P.'s lack of sexual intercourse prior to the sexual assault, there is no reasonable probability that, but for defense counsel's deficient performance, the result of the trial would have been different. So we conclude that Mr. Bell did not receive ineffective assistance of counsel when his attorney allowed defense exhibits to go to the jury room without redaction of the inadmissible evidence.

## IV. CONCLUSION

¶70 The State's trial commentary was not improper, which means there is no error, plain or otherwise, for us to address. That also means the State's commentary cannot serve as the basis for a claim of ineffective assistance of counsel. With respect to the inadmissible evidence submitted to the jury in two of the

defense's exhibits, we conclude there is no reasonable probability that redacting that evidence would have changed the result of the trial. Accordingly, we conclude Mr. Bell received a fair trial and is not entitled to a new one; we therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶71 PATIENCE DRAKE ROGGENSACK, C.J., withdrew from participation.

¶72 SHIRLEY S. ABRAHAMSON, J., did not participate.

¶73 ANNETTE KINGSLAND ZIEGLER, J.   *(concurring).*   I write to clarify why I join the court's opinion. In this writing I intend to concisely highlight the main holdings of the opinion.

¶74 This is a review of an unpublished decision of the court of appeals, State v. Bell, Nos. 2015AP2267-CR and 2015AP2668-CR, unpublished slip. op., (Wis. Ct. App. Dec. 1, 2016), affirming the Monroe County circuit court's[1] denial of Gerrod Bell's ("Bell") postconviction motion for a new trial.

¶75 In a consolidated criminal action by the State, Bell was charged with seven crimes relating to the sexual assaults of two minors, A.L. and T.P.  Majority op., ¶4.  The case proceeded to trial.  At different points during the trial, the prosecutor made a number of statements regarding witness credibility to the effect that (1) to find Bell not guilty the jury must believe that T.P. had lied (the "must believe" statements), and (2) to believe that T.P. had lied, there had to be evidence of a reason to lie (the "motive" statements).  Majority op., ¶41.  Defense counsel objected to these statements during the State's closing argument, but failed to properly preserve the objection by moving for a mistrial before the jury rendered its verdict.[2]

---

[1] The Honorable Michael Rosborough presided.

[2] During the State's closing argument, when it was going through its litany of "must believe" statements, defense counsel objected:

> [DEFENSE COUNSEL]: Your Honor, I'm concerned about how he's presenting this because I think he's reversing the burden of proof.

(continued)

1

Additionally, when reviewing exhibits requested by the jury, defense counsel failed to request the redaction of two exhibits that tended to establish T.P.'s "prior sexual conduct," which is inadmissible evidence pursuant to Wis. Stat. § 972.11(2)(b) (the "Rape Shield" statute). The jury ultimately found Bell guilty of all counts.

¶76 After the judgments of conviction were entered, Bell filed a postconviction motion under Wis. Stat. (Rule) § 809.30(2)(h) seeking a new trial. See majority op., ¶6. The circuit court denied Bell's motion for a new trial because it found that the prosecutor's statements did not violate Bell's constitutional rights given the totality of the circumstances at

---

(continued)

[STATE]: No I'm not Your Honor; I'm simply——

THE COURT: Well, this is argument; I think the jury understands that. It's not evidence and there has to be some latitude for advocacy during the course of argument. I'm not convinced that what he's saying is going beyond that at this point. And, of course, you still have the opportunity to get up there and make your presentation.

So let's proceed with that in mind.

As a procedural matter, this was insufficient to preserve the issue for direct appeal. See State v. Davidson, 2000 WI 91, ¶86, 236 Wis. 2d 537, 613 N.W.2d 606 (concluding that the defendant's failure "to make a timely motion for mistrial . . . before the jury returned its judgment constitutes a waiver of his objections to the prosecutor's statements during closing arguments"); see also majority op., ¶11 n.13. Bell acknowledges that this procedural requirement was not met, which is why he must raise the issues before the court in the context of plain error and ineffective assistance of counsel.

2

trial, namely that the jury had been properly instructed. Bell appealed.

¶77 The court of appeals affirmed. See Bell, unpublished slip op., ¶3. The court of appeals held that the prosecutor's statements were not misstatements of law; rather, the statements were a characterization of the evidence that was responsive to the defense's theory. Id., ¶36. Because it concluded that there was no error, the court of appeals did not reach the issues of whether the error was sufficient to entitle Bell to a new trial on the basis of plain error or ineffective assistance of counsel. Similarly, the court of appeals held that defense counsel's failure to request redaction of the exhibits was not ineffective assistance of counsel because the jury's review of unredacted exhibits did not result in prejudice. Id., ¶¶38, 48. Bell petitioned for review.

¶78 On review, we consider three issues: (1) Whether the prosecutor's statements constitute plain error so as to entitle Bell to a new trial; (2) whether Bell is entitled to a new trial because defense counsel's failure to properly preserve objection to the prosecutor's statements constitutes ineffective assistance of counsel; and (3) whether Bell is entitled to a new trial because defense counsel's failure to request redaction of the exhibits constitutes ineffective assistance of counsel.

I

¶79 We consider first whether the prosecutor's statements constitute plain error so as to entitle Bell to a new trial. We conclude that the prosecutor's "must believe" statements were

3

not improper, and, therefore, that there was no error, because their practical effect was only to "impress[] on the jury the importance of assessing the witnesses' credibility." Majority op., ¶51. We further conclude that the prosecutor's "motive" statements were not improper, and, therefore, that there was no error, because either they were not statements of law at all or they were not <u>mis</u>statements of law. Majority op., ¶¶55-57, 59. Thus, we conclude that Bell is not entitled to a new trial because there was no error. Majority op., ¶70. Here, I strive to clarify why the "must believe" statements do not amount to error.

¶80 Where witness testimony is the only evidence presented at trial, and, if credible, it is sufficient to prove guilt, it is not an error which requires reversal for the prosecutor to argue that, to find the defendant not guilty, the jury must believe the witnesses are lying. Majority op., ¶46. Here, this is true for two reasons. First, the prosecutor's arguments are not evidence. The court instructs the jury in that respect, and we properly rely on the assumption that the jury follows the instructions of the court. <u>See, e.g.</u>, <u>State v. Marinez</u>, 2011 WI 12, ¶41, 331 Wis. 2d 568, 797 N.W.2d 399.

¶81 Second, the witnesses' testimony——the sole evidence in this case——is sufficient to prove guilt; that is, it provides sufficient evidence to support a finding of guilt on every element the State is required to prove. Majority op., ¶46. While the jury could believe the witnesses and conclude the defendant is not guilty because the State has not met its burden

4

of proof, the jury will still need to assess the witnesses' credibility and determine what weight to attach to that testimony. In other words, the jury is instructed to determine who is believable and it is not beyond the jury's ability to discern which witnesses the State hopes the jury will find credible. We presume "that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision";[3] that is, a defendant cannot argue that a lawless jury is a possibility that renders otherwise sufficient evidence, insufficient. Majority op., ¶47.

¶82 I also agree with the majority that Vargas,[4] Cornett,[5] and Reed[6] are all distinguishable, in part because, in those cases, the credibility of the witnesses' testimony was not determinative of guilt. Majority op., ¶¶48-49; id., ¶49 n.14. I further recognize that, where the credibility of a witness' testimony is not the only thing at stake, the jury could find the defendant "not guilty" for some other reason, for example, if additional evidence offered is unpersuasive or persuasive. Thus, it could be a misstatement of law in those circumstances to say that to find the defendant not guilty, the jury must believe the witnesses are lying. Majority op., ¶45.

---

[3] Strickland v. Washington, 466 U.S. 668, 695 (1984).

[4] United States v. Vargas, 583 F.2d 380 (7th Cir. 1978).

[5] United States v. Cornett, 232 F.3d 570 (7th Cir. 2000).

[6] United States v. Reed, 724 F.2d 677 (8th Cir. 1984).

5

¶83 But that is not the circumstance here, and Amerson[7] and Sandoval[8] provide additional support for the conclusion that the prosecutor's statements were not improper because these cases demonstrate that the statements may be properly characterized as "impressing on the jury the importance of assessing the witnesses' credibility." Majority op., ¶51. In fact, that is what the prosecutor did here. The State impressed on the jury the apparent fact that the jury must determine the credibility of the witnesses and the weight to attach to their testimony. It urged the jury to do what the jury already knew the State wanted the jury to do. It was hardly a secret who the prosecutor hoped the jury would believe. But, unlike improperly vouching for a witness, the prosecutor here was merely telling the jury what it already knew: the State wanted the jury to find its witnesses credible.

¶84 In sum, I conclude that the prosecutor's "must believe" statements were not misstatements of law, especially in this case, where the witnesses' credible testimony is alone enough for the State to prove guilt, and is, in fact, the only proof offered. Majority op., ¶¶46-47. Additionally, the practical effect of the statements was only to "impress[] on the jury the importance of assessing the witnesses' credibility," majority op., ¶51, telling the jury what it already knew. The State's case rested on the jury believing a particular witness,

---

[7] United States v. Amerson, 185 F.3d 676 (7th Cir. 1999).

[8] United States v. Sandoval, 347 F.3d 627 (7th Cir. 2003).

6

but the prosecutor was not stepping into the shoes of the jury to tell them whom to believe.  The State was instead describing the duty of the jury to determine what testimony they find more appealing to their good judgment and common sense.

II

¶85  We consider second whether Bell is entitled to a new trial because defense counsel's failure to properly preserve objection to the prosecutor's statements constitutes ineffective assistance of counsel.  We conclude that Bell's defense counsel did not perform deficiently in failing to move for a mistrial prior to the verdict on the basis of the prosecutor's statements because the prosecutor's statements were not objectionable error.  Majority op. ¶59.  Thus, we conclude that Bell is not entitled to a new trial because there is no ineffective assistance of counsel where there is no deficient performance. Majority op., ¶70.

III

¶86  We consider third whether Bell is entitled to a new trial because defense counsel's failure to request redaction of the exhibits constitutes ineffective assistance of counsel. Although we hold that allowing the jury to review unredacted versions of the exhibits was error because admission of such evidence is prohibited under Wis. Stat. § 972.11(2)(b), majority op., ¶65, we conclude that the error was harmless because Bell's argument that the jury may have inferred T.P.'s prior sexual history from Dr. Budzak's testimony and the inadmissible contents of the exhibits is too speculative.  Majority op., ¶69.

7

Thus, we conclude that Bell is not entitled to a new trial because there is no ineffective assistance of counsel where the error does not prejudice the defendant.  Majority op., ¶70.

¶87  For the foregoing reasons, I respectfully concur.

¶88 ANN WALSH BRADLEY, J. *(dissenting).* At the foundation of our system of justice lies the principle that defendants do not have to prove their innocence. State v. Sawyer, 266 Wis. 494, 506, 63 N.W.2d 749 (1954). In fact, a defendant is entitled to a presumption of innocence and need not present any evidence at all at trial. See Johnson v. State, 85 Wis. 2d 22, 27, 270 N.W.2d 153 (1978); State v. Johnson, 11 Wis. 2d 130, 134, 104 N.W.2d 379 (1960).

¶89 As a corollary to this foundational principle, the State bears the burden to prove beyond a reasonable doubt every fact necessary to constitute guilt. State v. Schulz, 102 Wis. 2d 423, 427, 307 N.W.2d 151 (1981); In re Winship, 397 U.S. 358, 361-64 (1970). This burden remains with the State throughout the entirety of trial, and cannot be shifted to the defendant. Schulz, 102 Wis. 2d at 427.

¶90 Despite these well-established principles, the State in this case argued to the jury that the defendant has a burden to present evidence and convince the jury of the victims' motive to lie. Because the statements made during voir dire and closing argument misstated the law governing a jury's consideration of evidence and impermissibly shifted to the defendant a burden he does not carry, I respectfully dissent.

I

¶91 A jury convicted Bell of the sexual assault of two underage victims, T.P. and A.L. At trial, Bell's defense focused largely on the credibility of the victims. Both Bell and the State presented extensive argument on this subject.

1

¶92 The question is whether certain arguments made by the State, referred to by the majority as the "must believe" statements and the "motive" statements, crossed the line so as to impermissibly shift the burden of proof from the State to the defendant. Because it is dispositive, I focus my analysis on the "motive" statements only.

II

¶93 The "motive" statements framed the State's entire case. Setting the stage during voir dire, the prosecutor asked the jury panel, "Would everybody agree here that . . . if you're going to lie, you're going to have a reason like jealousy of some sort; there's going to be a reason why you would lie?"

¶94 Probing further, the prosecutor then posed the question to individual jurors, "Would you expect there would be some evidence that somebody would have a reason to lie? There would be some sort of evidence that this person would have a reason to lie[.]" Conflating the burden of proof jury instruction with the instruction on credibility of witnesses, the prosecutor began to instruct the jury panel on the law. He advised that the "jury instructions on reasonable doubt" do not allow the jury to speculate, and that the jury must instead

"just look at the facts, the evidence or lack of evidence in this case" with regard to witness credibility.[1]

¶95 During closing argument, the State built on the theme introduced in voir dire, repeatedly contending that there was no evidence demonstrating that the victims had lied.  Majority op., ¶¶34-35.  It advanced that in the absence of such evidence the jury should believe the victims.  See id., ¶35.  Specifically, the State argued to the jury, "if somebody is going to make a flat out lie about something, they're going to have a reason. They're going to have some evidence of that reason."  The State further asserted that Bell "has no idea why [the victim] would make this up.  He says that repeatedly and he . . . just begins to speculate."

¶96 The State suggested next that if no evidence was presented regarding the victims' motive to lie, then the jury would be left with only speculation as to their credibility.  It contended that Bell "just begins to make guesses after he says he has no idea why she would make this up."  In concluding this segment of its closing argument, the State reiterated, "If a person lies about something, they must have a reason.  And the reason why there is no evidence in this case about why anybody would lie is because they're not lying."

---

[1] The jury instruction on burden of proof indicates that "[a] reasonable doubt is not a doubt which is based on mere guesswork or speculation."  Wis JI——Criminal 140 (2000).  But when the prosecutor spoke of speculation and evidence, he was speaking not of the ultimate burden of proof on the State to prove guilt beyond a reasonable doubt, but of witness credibility, thus conflating the two instructions.

3

¶97 Following Bell's closing argument, the State returned for rebuttal.  It doubled down on its previous arguments, asserting "[t]here's never testimony they were lying because [they have a bad life].  There's no testimony they were lying for any other reason.  There's no testimony that they were lying.  There's no evidence that they were lying. . . . And we're supposed to look at the evidence or lack of evidence."  The State then admonished the jury that it is forbidden from speculating as to why the victims would lie.

¶98 According to the State, who has to come up with this important evidence of motive?  The State?  Certainly  not.  Rather, according to the State's distortion of the burden of proof instruction, it is the defendant who must introduce this evidence.  Yet, a theory of defense that the witnesses are lying should not be transformed into a shift of the burden of proof, requiring that the defendant offer evidence of motive to lie.

¶99 The majority, however, does not see a problem with the prosecutor's statements, contending that "it is a matter of general life experience that people normally do not lie without reason:  It is common sense that people do not lie unless there is a reason behind the lie.  That is, at least ordinarily, and arguably by definition, a lie is the result of a decision to convey a falsehood."  Majority op., ¶55 (quoting State v. Bell, Nos. 2015AP2667-CR & 2015AP2668-CR, unpublished slip op., ¶32 (Wis. Ct. App. Dec. 1, 2016)).  In the majority's view, the State's arguments "fell into the category of persuasion" because they "consist of observations about this common-sense principle

and an encouragement not to discard it as [jurors] weighed the victims' credibility."  Id.

¶100 However, what becomes apparent upon reading the transcript in this case is that the State essentially misinformed the jury that it could not find the victims lacking in credibility unless Bell presented "evidence" of their motive to lie.  Such an assertion is legally incorrect.  Pursuant to well-established precepts, Bell need not do anything of the sort.  See Sawyer, 266 Wis. at 506.

¶101 Even accepting the majority's dubious premise that there is always a reason behind an untruthful statement, such a premise does not require that a defendant present evidence of a witness's motive to lie.  Indeed, as observed above, the defendant has no burden to present any evidence whatsoever, let alone evidence proving a motive.  See Johnson v. State, 85 Wis. 2d at 27.

¶102 Here the State's remarks are akin to those at issue in U.S. v. Smith, 500 F.2d 293 (6th Cir. 1974).  In Smith, the prosecutor made the statement in closing argument "that the jury should 'require' the defendants to present a 'reasonable explanation' of the meaning of taped wiretap evidence, other than the criminal meaning he ascribed to the conversations[.]" Id. at 294.  In other words, the prosecutor implored the jury to require the defendant to present evidence, shifting the burden of proof.  See id.

¶103 The Smith court determined that "[t]he challenged comments of the prosecutor were clearly improper argument."  Id.

5

at 295.   The remarks "had the effect of shifting the burden of proof from the government to the defendants and abrogating the presumption of innocence to which [the defendants] were entitled."  Id. at 294.

¶104 In reaching this result, the Smith court forewarned that "[i]t is, of course the duty of the prosecutor to advance the government's cause with force and persuasiveness.  However, this duty includes concerns in addition to mere advocacy."  Id. at 295.  Specifically, the prosecutor is entrusted with "the responsibility of observing in practice the principles considered under our system to be essential to a fair and just criminal procedure[,]" thereby protecting the constitutional right to due process.  Id.

¶105 Smith is not alone in distinguishing between lawful advocacy and an unlawful shift of the burden of proof.  Courts around the country have determined that a shift of the burden of proof to the defendant constitutes a denial of the required "fair and just criminal procedure."  See, e.g., People v. Santana, 255 P.3d 1126, 1130 (Colo. 2011) (explaining that it is impermissible for a prosecutor to "shift the burden of proof through argument or comment"); People v. Fyda, 793 N.W.2d 712, 723 (Mich. Ct. App. 2010) ("A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof."); State v. Roman Nose, 667 N.W.2d 386, 399 (Minn. 2003) ("[A] prosecutor may not comment on a defendant's failure to call witnesses or to

contradict testimony because such comments might lead the jury to believe that the defendant has a duty to call witnesses or bears some burden of proof.").

¶106 I agree with the majority that, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones." Majority op., ¶16 (citing Berger v. United States, 295 U.S. 78, 88 (1935)). However, the majority errs in its application of this principle.

¶107 Like the blows landed by the prosecutor in Smith, the jabs the State takes in this case are foul. They constitute a "clearly improper argument" that "shift[s] the burden of proof from the government to the defendants and abrogate[s] the presumption of innocence" to which Bell is entitled. See Smith, 500 F.2d at 294-95. In short, Bell has no burden of proof, yet the State's comments placed one on him.

¶108 The error here is not a mere evidentiary error. Rather, it constitutes a violation of the due process right to a fair trial by distorting the burden of proof jury instruction, thus shifting the burden of proof to the defendant.

¶109 When a defendant alleges that a prosecutor's statements constituted plain error, as does Bell, the burden is on the State to prove that the error is harmless beyond a reasonable doubt. State v. Mayo, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115. Because I determine that on this record the State has failed to make such a showing, I respectfully dissent.